[L.A. No. 31758. Aug. 5, 1985.]

MICHELLE W., a Minor, etc., et al., Plaintiffs and Appellants, v.
RONALD W. et al., Defendants and Respondents.

COUNSEL

Bruce M. Beals, Kimberly J. Grove, Lightner & Castro and Sheela, Lightner & Castro for Plaintiffs and Appellants.

Latham & Watkins, Lance B. Wickman and Robert P. Dahlquist for Defendants and Respondents.

OPINION

REYNOSO, J.—No human bond is cemented with greater strength than that of parent and child. We address the claims of two who assert they are the father of a daughter. One was the mother's husband; he raised, loved and nurtured the child until temporarily prevented from doing so after a divorce. The second claimant contends he is the natural father, has since

married the mother and now lives with her and the child. By this triangular litigation each claimant seeks to be declared the legal father; the child, too, seeks a determination.

Evidence Code section 621 declares the presumption that ". . . the issue of a wife cohabiting with her husband . . . is presumed to be a child of the marriage."[1] In conformity with the statute, the trial court entered summary judgment in favor of the defendant below, Ronald W. Plaintiffs Donald R. and Michelle W., a minor, appeal challenging the constitutionality of the statute as applied to them. As will appear below, we hold that as applied to plaintiffs the statutory presumption violates neither the due process nor equal protection clauses of the California or United States Constitutions.

I

Defendants Ronald and Judith W. were married on May 7, 1965, and lived together as husband and wife until their separation approximately 12 years later. Judith gave birth to two daughters, Tamara and Michelle, who were raised as the children of that marriage. During the marriage to Judith, Ronald W. provided the necessary support for the children. As the father of Tamara and Michelle, he tended, nurtured and loved them and received affection from them. Through their daily interchanges with Ronald and Judith, Tamara and Michelle were provided with the security, as well as the restraints, they needed for their growth and development.

Donald R., the second claimant to the paternity of Michelle, met Judith in 1973. Donald R. and Judith began having sexual relations in that year, although Judith and Ronald W. were married and living together. On October 24, 1974, Judith gave birth to Michelle. Donald R. did not claim paternity at the time of birth nor thereafter for four years while Judith and Ronald W. remained married and continued to live together. Donald R.

---

[1]All further statutory references are to the Evidence Code. Section 621, subdivision (a) states in full that: "(a) Except as provided in subdivision (b), the issue of a wife cohabiting with her husband, who is not impotent or sterile, is conclusively presumed to be a child of the marriage."

Subdivision (b) allows rebuttal of the presumption of subdivision (a) by blood test evidence. Subdivisions (c) and (d) provide that such evidence must be presented within two years of the child's birth.

Plaintiffs do not challenge and we do not now address any question regarding the adequacy of the two-year statute of limitations, although we note that the United States Supreme Court decision in *Mills* v. *Habluetzel* (1982) 456 U.S. 91 [71 L.Ed.2d 770, 102 S.Ct. 1549] suggests that this raises due process concerns.

We note that the version of section 621 which was in effect in 1981, the date plaintiffs filed their action, differs somewhat from that now in effect. Because plaintiffs challenge— and the appellate court analyzed—the present version of section 621, our decision, too, is based on the present statute.

asserted no claim nor accepted any responsibility. Throughout that time, without objection from Donald R., the obligation of parenting was fulfilled by Ronald W.

When Ronald and Judith W. separated they executed a marriage settlement agreement; Ronald was granted custody of Tamara, Michelle's sister, and Judith custody of Michelle, by then nearly five years of age. The issue of paternity was not raised. Ronald's obligation to provide child support for Michelle was also not at issue; it was agreed upon.

Following the dissolution of their marriage, Ronald W. regularly and continually exercised his visitation rights with Michelle. In November 1980, when Donald R. married Judith, Ronald W. was refused further visitation. That right was restored when he threatened court action to enforce the settlement agreement. Since Judith's marriage to Donald R., Michelle has lived in Donald R.'s home and he has held her out to be his natural child.

In March 1981, this action to establish paternity was brought by Donald R. and Michelle, age six, through her guardian ad litem. Upon the uncontradicted facts that Ronald W. and Judith were living together as a married couple for nine years before Michelle's birth and that Ronald W. was neither impotent nor sterile, the trial court applied the presumption of section 621 and established that Ronald W. is the father of Michelle. Plaintiffs appeal.

## II

The presumption of paternity established by section 621 is limited. The following prerequisites must be satisfied: first, the child's mother must be married; second, the mother must be cohabiting with her husband; third, the husband must be neither impotent nor sterile; fourth, two years must have passed since the birth of the child and during those two years the husband—or the mother in conjunction with the putative father—must have failed to rebut the presumption in court.

Plaintiffs assert alternative grounds for holding section 621 unconstitutional. First, section 621 prevents them from establishing the biological parent-child relationship in a court of law, thus depriving them of a liberty interest protected by the due process clause. Second, the gender-based classification of the statute which accords the natural father fewer procedural protections than the married natural mother violates the equal protection

guarantee of the California and United States Constitutions.[2] In addition, they argue that the classifications in the statute deny them a fundamental right and thus the law should be strictly scrutinized.

## A. *Due Process Claims*

We review two interests, that of the child and that of the alleged natural father. As to plaintiff Donald R., we hold that the statute is constitutional as applied. No due process violation can be found in applying the presumption to the facts of this case. Our conclusion is based upon a weighing of the competing private and public interests. We find that the public interest in protecting the family unit and promoting familial stability outweighs Donald R.'s interest.

### 1. *The Putative Father's Claim*

■ Does the application of the presumption of section 621 violate Donald R.'s due process rights? ■ We have held that the issue of whether section 621 adequately protects a putative father's interests "must be resolved by weighing the competing private and state interests." (*In re Lisa R.* (1975) 13 Cal.3d 636, 648 [119 Cal.Rptr. 475, 532 P.2d 123, 90 A.L.R.3d 1017], cert. den. (1975) 421 U.S. 1014 [44 L.Ed.2d 682, 95 S.Ct. 2421], rehg. den. (1975) 423 U.S. 885 [46 L.Ed.2d 116, 96 S.Ct. 159].) *In Board of Regents* v. *Roth* (1972) 408 U.S. 564, 570 [33 L.Ed.2d 548, 570, 92 S.Ct. 2701], the high court explained that "a weighing process has long been a part of any determination of the *form* of hearing required in particular situations. . . ." (Italics in original.)

The United States Supreme Court has scrutinized, under the due process clause, state laws limiting a natural father's relationship with his illegitimate offspring in three seminal cases,[3] *Stanley* v. *Illinois* (1971) 405 U.S. 645 [31 L.Ed.2d 551, 92 S.Ct. 1208], *Quilloin* v. *Walcott* (1978) 434 U.S. 246 [54 L.Ed.2d 511, 98 S.Ct. 549], rehg. den. (1978) 435 U.S. 918 [55

---

[2]The Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law; nor deny any person within its jurisdiction the equal protection of the laws." A similar provision is contained in the California Constitution, article I, section 7, subdivision (a) which states that "[a] person may not be deprived of life, liberty, or property without due process of law or denied equal protection of the laws. . . ."

Although we deny plaintiffs' claims under both Constitutions, we do not hold that the provisions are identical in scope and purpose in all cases.

[3]The issue was also raised in *Caban* v. *Mohammed* (1979) 441 U.S. 380 [60 L.Ed.2d 297, 99 S.Ct. 1760]. Because that case was decided on equal protection grounds, the court expressed no view on the due process challenge. (*Id.*, at p. 394, fn. 16 [60 L.Ed.2d at p. 308].)

L.Ed.2d 511, 98 S.Ct. 1477], and most recently in *Lehr* v. *Robertson* (1983) 463 U.S. 248 [77 L.Ed.2d 614, 103 S.Ct. 2985].

In *Stanley,* an unwed father lost custody of his three children upon the death of the children's unwed mother. The father, Stanley, had lived with the children and their mother since their birth and they were summarily taken and placed with court-appointed guardians without any prior hearing. This deprivation was found to violate the due process clause of the Fourteenth Amendment. Justice Powell, writing for the court, concluded that Illinois, "insists on presuming rather than proving Stanley's unfitness solely because it is more convenient to presume than to prove. Under the Due Process Clause that advantage is insufficient to justify refusing a father a hearing when the issue at stake is the dismemberment of his family." (405 U.S., at p. 658 [31 L.Ed.2d at p. 562].) Thus, Illinois could not automatically destroy the Stanley family and uproot the children without first providing the father with the opportunity to be heard on the issue of parental fitness.

The limits on a putative father's due process rights were addressed in *Quilloin* v. *Walcott, supra,* 434 U.S. 246, where the Supreme Court held that a Georgia statute which denied an unwed father the right to veto an adoption of his illegitimate child did not violate the due process clause. The father in that case only sought to claim paternity after the mother and her new husband had initiated adoption proceedings. The court held that the denial of the father's legitimation petition—found by the trial court to be in the child's best interest—did not violate the due process clause.

Finally, the court most recently addressed this issue in *Lehr* v. *Robertson, supra,* 463 U.S. 248. Lehr, the putative father, sought to invalidate an adoption order granted in favor of the biological mother and her husband. The child was already two years old at the time and the father "never had any significant custodial, personal, or financial relationship with [the child], and he did not seek to establish a legal tie until she was two years old." (*Id.,* at p. 262 [77 L.Ed.2d at p. 627], fn. omitted.)

This court has examined the conclusive presumption of paternity in *Lisa R., supra,* 13 Cal.3d 636, where a putative father sought to continue the parent-child relationship he had established with his daughter. In *Lisa R.,* although the minor child was presumed to be legitimate, both of her parents were deceased and the child was being adjudicated a dependent of the juvenile court. With adoption proceedings by foster parents pending, Lisa's putative father sought to prove his paternity and obtain visitation rights. Following the United States Supreme Court's decision in *Stanley* v. *Illinois,*

*supra*, 405 U.S. 645, we held that the Evidence Code's preclusion of proof of paternity offended the constitutional guarantee of due process of law.

■■■ The difference between the state-threatened dissolution and termination of a developed parent-child relationship in *Stanley* and *Lisa R.* and the denial of a legal determination of paternity in the case at bench is clear and significant. As we recently noted, "In both *Stanley* and *Lisa R.*, the putative fathers were seeking to establish their legal relationship with children who otherwise had no parents and were wards of the state." (*Estate of Cornelious* (1984) 35 Cal.3d 461, 466 [198 Cal.Rptr. 543, 674 P.2d 245], app. dism. (1984) 466 U.S. 967 [80 L.Ed.2d 812, 104 S.Ct. 2337].)

This is not a case where the state has attempted to intervene or to prevent the establishment of a relationship between putative father and child.[4] Rather, Donald R. seeks a determination that he is Michelle's "legal" father, notwithstanding the established and continuing emotional and financial father-daughter relationship between Michelle and Ronald.[5] Accordingly, we conclude that Donald's abstract interest in establishing paternity is not as weighty as the interests of the fathers in *Stanley* and *Lisa R.*

We turn to the interests of the state. Numerous policy considerations have been cited in favor of a conclusive presumption of paternity, including certain social policies upholding the integrity of the family (*Kusior* v. *Silver* (1960) 54 Cal.2d 603, 619 [7 Cal.Rptr. 129, 354 P.2d 657]), and protecting the child's welfare (*In re Lisa R.*, *supra*, 13 Cal.3d at pp. 649-650).

Thus, section 621 does not purport to factually determine the biological paternity of a child. (*Kusior* v. *Silver*, *supra*, 54 Cal.2d at p. 619.) We note that, as stated by the United States Supreme Court, "[t]he actions of judges neither create nor sever genetic bonds." (*Lehr* v. *Robertson*, *supra*, 463

---

[4]We leave open the question of the validity of section 621 as applied to such situations or to termination situations for a case in which the issue is squarely presented.

[5]Ronald W. argues, without citation to authority, that in enacting section 621 the Legislature sought to prevent children from being stigmatized as "illegitimate." Even assuming that this argument is correct, this state's subsequent adoption of the "Uniform Parentage Act" (Civ. Code, § 7000 et seq., added by Stats. 1975, ch. 1244, § 11, pp. 3196-3204) has rendered such a consideration to be without any legal effect. The act, approved in 1973 by the National Conference of Commissioners on Uniform State Laws (see Uniform Parentage Act, Comrs. Prefatory Note, 9A U.L.A. (Master ed. 1979) pp. 579-582), "makes a revolutionary change in the law by abolishing the incidents of illegitimacy and establishing legal equality of children without regard to the marital status of their parents" (6 Witkin, Summary of Cal. Law (8th ed., 1984 supp.) Parent and Child, § 242A, p. 326). As now provided by Civil Code section 7002, "[t]he parent and child relationship extends equally to every child and to every parent, regardless of the marital status of the parents." Accordingly, we reject Ronald's argument that the "stigma" of illegitimacy should be considered in determining the constitutionality of section 621.

U.S. at p. 261 [77 L.Ed.2d at p. 626].) The interests noted above apply to the facts of the case at bench. Here, Donald R.'s private interest in establishing a biological relationship in a court of law is overridden by the substantial state interests in familial stability and the welfare of the child. Accordingly, the application of section 621 to the instant case comported with the requirement of due process of law.

## 2. The Child's Claim

The second interest to consider in this case, the interest of Michelle in a legal determination of who her biological father is, has been treated by the other litigants as an appendage to the rights of the putative father. The guardian ad litem for Michelle is a family friend of Donald and Judith R. Michelle is represented by the same attorney as Donald R. and their interests have been continually asserted as being consistent with each other. Our concern is that Michelle is not the real actor behind this "child" paternity suit and that she may be asserting a right which may or may not be in her best interests.[6] We are not convinced under the circumstances of this case, that Michelle's rights are greater than those afforded to Donald R.

In *Estate of Cornelious, supra,* 35 Cal.3d 461, we held that the guarantee of due process of law was not offended when a child was precluded from proving paternity by the operation of section 621. In *Estate of Cornelious,* as in the case at bench, we apply a balancing test to resolve an as-applied challenge to the statute in question. (35 Cal.3d at p. 467.) Because Michelle's rights have not been argued to be separate from Donald R.'s we cannot conclude that her interest in establishing paternity outweighs the state's interest in preserving and protecting the developed parent-child and sibling relationships which give young children social and emotional strength and stability. Given the facts that Michelle has a legal father and that he opposes this attempt to have Donald R. declared the biological father, we are unpersuaded that a judicial juggling of Michelle's family relationships is warranted by her abstract interest in establishing paternity.

We reject plaintiffs' suggestion that section 621 as applied to Michelle is constitutionally defective pursuant to the authority of *Vlandis* v. *Klein* (1973) 412 U.S. 441 [37 L.Ed.2d 63, 93 S.Ct. 2230]. In *Vlandis* the United

---

[6]The possibility exists for a conflict between a child's interest and that of the putative father. For example, it has been noted that "[u]nlike adults, children have no psychological conception of relationship by blood-tie until quite late in their development. For the biological parents, the facts of having engendered, borne, or given birth to a child produce an understandable sense of preparedness for proprietorship and possessiveness. These considerations carry no weight with children who are emotionally unaware of events leading to their births." (Goldstein et al., Beyond the Best Interests of the Child (1973) at p. 12.)

States Supreme Court invalidated a permanent and irrebuttable presumption that students who were nonresidents when they applied to attend state universities remained nonresidents for purposes of assessing fees and tuition.[7] While *Vlandis* involved a purported factual determination of residency, section 621 does not purport to determine biological paternity. Rather, it is "in actuality a substantive rule of law" designed to further public policies. (*Kusior v. Silver, supra,* 54 Cal.2d 603, at p. 619.)

Furthermore, because we apply the balancing test utilized in *Estate of Cornelious,* we cannot conclude that the presumption of section 621 is necessarily irrebuttable. Simply because Donald R. and Michelle are unable to rebut the presumption does not mean that we interpret section 621 to be a "conclusive and unchangeable presumption." (*Vlandis v. Klein, supra,* 412 U.S. at p. 443 [37 L.Ed.2d at p. 66].) Rather, we merely conclude that the denial of Michelle's motion for blood tests was justified because the state interests outweighed her abstract interest in vindicating true parentage.

Michelle is not being threatened with termination of her association with Donald R. She is not even being prevented from obtaining information as to who her biological father is. As stated by the United States Supreme Court, the extent to which due process must be afforded an individual "is influenced by the extent to which he may be 'condemned to suffer grievous loss.'" (*Goldberg v. Kelly* (1970) 397 U.S. 254, 262-263 [25 L.Ed.2d 287, 296, 90 S.Ct. 1011].) We cannot say that denying Michelle the opportunity to present blood test evidence in a court of law violates the guarantee of due process of law.

B. *Equal Protection*

The guarantee of equal protection ensures that "no person or class of persons shall be denied the same protection of the laws which is enjoyed by other persons or classes in like circumstances . . . ." (*People v. Romo* (1975) 14 Cal.3d 189, 196 [121 Cal.Rptr. 111, 534 P.2d 1015].) Specifically, a sovereign may not subject men and women to disparate treatment where there is no substantial relationship between the classification and an important governmental purpose. (*Reed v. Reed* (1971) 404 U.S. 71, 76 [30 L.Ed.2d 225, 229, 92 S.Ct. 251]; *Craig v. Boren* (1976) 429 U.S. 190,

---

[7]We also reject plaintiffs' argument that *Vlandis* requires invalidation of a conclusive presumption whenever there is a "reasonable alternative means" of proving the presumed fact. In *Vlandis* the existence of other methods of proving residency was one factor in the Supreme Court's analysis. In invalidating the statutory presumption, the court discussed the state's purposes for the presumption and determined that those were not served by applying the presumption to the case before it. (412 U.S. 441, at pp. 448-452 [37 L.Ed.2d 63, 69-71, 93 S.Ct. 2230].)

197 [50 L.Ed.2d 397, 407, 97 S.Ct. 451], rehg. den. (1977) 429 U.S. 1124 [51 L.Ed.2d 574, 97 S.Ct. 1161].)

█ Section 621 allows the natural mother of the child to bring a suit to rebut the presumption that her husband is the child's father. Plaintiffs claim that this constitutes an impermissible gender-based distinction because the putative father is not allowed to rebut the presumption.[8] We disagree.

Subdivision (d) of section 621 states: "The notice of motion for blood tests under subdivision (b) may be raised by the mother of the child not later than two years from the date of birth if the child's biological father has filed an affidavit with the court acknowledging paternity of the child." We note that the plain word of the statute indicates that the rights of the natural married mother and the natural unwed father are conditioned upon each other.

Thus, this case is distinguishable from *Caban* v. *Mohammed, supra,* 441 U.S. 380. In that case the Supreme Court invalidated a statutory scheme under which only unwed mothers—and not unwed fathers—received hearings prior to a termination of child custody.

In *Caban,* one parent had an absolute unconditional right and the other parent had absolutely none. In our due process analysis, we have declined to interpret section 621 as an absolute bar to all suits to establish paternity by either the putative father or the presumed legitimate child. Rather, we have applied the balancing test analysis of *Lisa R.* and *Estate of Cornelious.* In contrast to *Caban,* although Donald R. and Michelle are not able to rebut the presumption under the facts of this case, this does not mean that all putative fathers and all presumed legitimate children are barred in all cases. Thus, we fail to find that the statutory scheme, as interpreted by the courts and as applied to plaintiffs' case, violates the guarantee of equal protection of the laws.

The judgment is affirmed.

Mosk, J., Kaus, J., Broussard, J., and Grodin, J., concurred.

**BIRD, C. J.**—I respectfully dissent. The application of the conclusive presumption of paternity (Evid. Code, § 621) to deny plaintiff, Donald R., the

---

[8]Michelle's guardian and Donald R. also argue that putative fathers are denied a fundamental right to establish a parent-child relationship. As discussed in our due process analysis of this case, we fail to find such a deprivation. The association between Donald R. and Michelle is already enjoyed and the state does not seek its disruption or its termination.

opportunity to prove that he is Michelle's biological father denies him due process of law. (U.S. Const., 14th Amend.; Cal. Const., art. I, § 7, subd. (a).)

In upholding the presumption here, the majority purport to weigh the competing private and public interests as required by *In re Lisa R.* (1975) 13 Cal.3d 636, 648-651 [119 Cal.Rptr. 475, 532 P.2d 123, 90 A.L.R.3d 1017] and *Estate of Cornelious* (1984) 35 Cal.3d 461, 467 [198 Cal.Rptr. 543, 674 P.2d 245]. However, the majority's weighing of interests proceeds according to a most curious logic.

At the outset, the majority tip the scales in favor of Ronald W. when they label him "the father" (maj. opn., *ante,* at p. 358) and the "legal father" (*id.,* at p. 363) of Michelle. Those labels beg the question to be decided, since plaintiffs seek a declaration that Donald R. is the legal father. Similarly, the majority suggest that Ronald W.'s relationship with Michelle will be jeopardized unless the presumption is upheld. Yet, they fail to explain how that relationship is threatened by plaintiffs' attempt to rebut the presumption.

On the other end of the scale is plaintiffs' interest in establishing that Donald R. is the father. The majority focus narrowly on the apparent security of Donald R.'s current relationship with Michelle and disregard the legal vulnerability of that bond. (See Bartlett, *Rethinking Parenthood as an Exclusive Status: The Need for Legal Alternatives when the Premise of the Nuclear Family has Failed* (1984) 70 Va. L.Rev. 879, 912-919 [hereafter *Rethinking Parenthood*].) Having thus limited the scope of inquiry, they conclude without difficulty that plaintiffs have only an "abstract interest in establishing paternity." (Maj. opn., *ante,* at p. 362.) According to the majority, this "abstract" interest is outweighed by the public interest in protecting the stability of a family unit which ceased to exist years ago. (See *id.,* at p. 360.) This is a strange sort of weighing indeed.

The state's interest in preserving the integrity of the family unit (*In re Lisa R., supra,* 13 Cal.3d at p. 650; *Kusior* v. *Silver* (1960) 54 Cal.2d 603, 619 [7 Cal.Rptr. 129, 354 P.2d 657]) is not even implicated here. The family unit formerly composed of Ronald W., Judith W., Michelle, and her sister no longer exists. It was destroyed when Ronald W. and Judith W. divorced. The majority's assertion that this nonexistent family unit is threatened by plaintiffs' action to establish paternity is baffling.

Equally baffling is their assumption that Ronald W.'s relationship with Michelle is threatened. Ronald W. currently enjoys rights to regular visitation with Michelle. These rights, which arose from the years in which he

accepted daily parental responsibility for her, would continue to protect his interest in visitation even if Donald R. were declared the legal father. (See *post,* at pp. 367-371.) Accordingly, it is not necessary to uphold the conclusive presumption in order to protect Ronald W.'s interest.

Prior to the institution of the proceedings leading to this appeal, Ronald W. was obligated to provide for Michelle's support by statute (Civ. Code, §§ 196, 196a)[1] and by a provision in his marriage settlement agreement with Judith W. Similarly, he was entitled to reasonable visitation with Michelle both by statute (§ 4601)[2] and by the terms of the agreement. The majority are unable to explain how these obligations and rights would be altered, much less destroyed, by a decision permitting Donald R. to offer scientific proof that he is Michelle's biological father.

Let's assume for the moment that a judgment declaring Donald R. to be Michelle's biological father would terminate Ronald W.'s status as a "father" under sections 196 and 196a. Nothing in this record or in the authorities cited by the parties suggests that Ronald W.'s support obligation and visitation rights under the marriage settlement agreement would disappear. (Compare § 229 [*adoption* decree automatically terminates the parents' duties towards, and rights over, a child who is adopted].)

The argument may be taken a step further. Assume that all of Ronald W.'s rights and obligations, both as a "father" under sections 196 and 196a and as a party to the marriage settlement agreement, would be extinguished upon a judicial declaration that Donald R. is Michelle's biological father. Ronald W. would then be left with the legal status of a former stepparent. However, even under these circumstances, his relationship with Michelle would not be jeopardized.

The rights of stepparents were persuasively asserted by the Utah Supreme Court in *Gribble* v. *Gribble* (Utah 1978) 583 P.2d 64 [1 A.L.R.4th 1263]. In that case, a wife filed a divorce action. The husband counterclaimed for visitation rights with the wife's son by a previous marriage. The husband had not adopted the son. However, he claimed that he had lived with the boy for four years, that he had treated him as his own son, and that he was concerned about the boy's future. The trial court held as a matter of law that a stepparent was not entitled to a hearing on the issue of visitation. (*Id.,* at p. 65.)

---

[1]Unless otherwise noted, all statutory references are to the Civil Code.

[2]Section 4601 provides: "Reasonable visitation rights shall be awarded to a parent unless it is shown that such visitation would be detrimental to the best interests of the child. In the discretion of the court, reasonable visitation rights may be granted to any other person having an interest in the welfare of the child."

The Utah Supreme Court reversed and remanded, holding the stepfather entitled under the due process clause of the state constitution to a hearing to determine whether he stood *in loco parentis* to the boy. The court held that a stepparent who has assumed the status and obligations of a parent without formal adoption is entitled to the same visitation rights as a natural parent. (*Gribble, supra,* 583 P.2d at pp. 67, 68.) It also noted that divorce does not terminate the stepparent's *in loco parentis* status. Only the stepchild or the stepparent may terminate that relationship. (*Id.,* at p. 67.)

*Gribble*'s application of the *in loco parentis* doctrine to stepparent visitation rights is cited with approval in *Perry v. Superior Court* (1980) 108 Cal.App.3d 480, 486 [166 Cal.Rptr. 583] (conc. opn. of Hopper, J.). In this marital dissolution action, the superior court entered an order granting a husband visitation privileges with the wife's minor child by a former marriage.

The Court of Appeal granted the wife's petition for a writ of prohibition, holding that in a divorce proceeding a superior court lacks jurisdiction to award visitation privileges to a spouse who is not the natural or adoptive parent of the other spouse's child. (*Perry, supra,* 108 Cal.App.3d at pp. 484-485.)[3] Dissatisfied with the result it was compelled to reach, the court invited the Legislature to address the "thorny problem of visitation by stepparents." (108 Cal.App.3d at p. 485.)

In his concurring opinion, Justice Hopper noted that the husband had not alleged that he stood *in loco parentis* to the child. "[I]f [the] husband had raised the issue and had been found by the superior court to be *in loco parentis* with regard to Lonnie, one could conclude that Lonnie was a 'child of the marriage' within Civil Code section 4351 [citations]." (*Perry, supra,* 108 Cal.App.3d at p. 486 (conc. opn. of Hopper, J.); see also *In re Marriage of Halpern* (1982) 133 Cal.App.3d 297, 307 [184 Cal.Rptr. 740].)

The 1982 Legislature, in an apparent response to the *Perry* court's invitation, added section 4351.5 to the Civil Code. Subdivision (a) of section 4351.5 gives the superior court in a marriage annulment or dissolution proceeding jurisdiction to award reasonable visitation rights to a stepparent.[4]

---

[3]In marital dissolution actions, the jurisdiction of the superior court over child custody and visitation matters is restricted to the " 'minor children of the marriage.' " (*Perry, supra,* 108 Cal.App.3d at p. 484, quoting § 4351; see also § 5151, subd. (2).)

[4]Subdivision (a) of section 4351.5 provides: "Notwithstanding the provisions of Section 4351, in proceedings under Sections 4450 [annulment] and 4503 [dissolution or legal separation], the superior court has jurisdiction to award reasonable visitation rights to a person who is a party to the marriage that is the subject of the proceeding with respect to a minor child of the other party to the marriage, if visitation by that person is determined to be in the best interests of the minor child."

The statute provides for mandatory mediation (subd. (c)) and a court hearing if mediation fails to produce a settlement (subd. (h)). Both the stepparent seeking visitation rights and any natural or adoptive parent must be given notice of the mediation (subd. (i)), notice of any subsequent hearing, and an opportunity to appear and be heard at such hearing (subd. (h)). Visitation rights may be awarded to the stepparent if the court determines that such visitation is in the best interests of the child. (Subd. (a); see generally Witkin, Summary of Cal. Law (8th ed., 1984 supp. to vol. 6) Parent and Child, § 83A, pp. 217-218.)

The enactment of section 4351.5 did not supplant the alternative method by which a superior court may award stepparent visitation under the *in loco parentis* doctrine. (*Perry* v. *Superior Court, supra,* 108 Cal.App.3d at p. 486 (conc. opn. of Hopper, J.).) The courts of this state have repeatedly held that one standing *in loco parentis* to a child has the same rights and duties as a natural parent.

" 'It is the well-settled law that one standing *in loco parentis* to those held out as members of his family is entitled to all the rights of a parent. He also incurs the same liability with respect to them that he is under to his own children. The relation being established, the reciprocal rights, duties, and obligations pertaining to it arise between them the same as if he [were] their natural father.' " (*Trudell* v. *Leatherby* (1931) 212 Cal. 678, 682 [300 P. 7], overruled on another point in *Gibson* v. *Gibson* (1971) 3 Cal.3d 914, 923 [92 Cal.Rptr. 288, 479 P.2d 648]; see *Loomis* v. *State of California* (1964) 228 Cal.App.2d 820, 823 [39 Cal.Rptr. 820]; cf. *Adoption of McDonald* (1954) 43 Cal.2d 447, 458-460 [274 P.2d 860] [agency to which child is relinquished for adoption does not acquire the right of a natural parent to withhold consent to adoption; like that of a guardian, an adoption agency's relationship to a child lacks the "natural affection between parent and child" which is the basis of a natural parent's rights].)

More recently, this court stated that "[t]he fact of biological parenthood may incline an adult to feel a strong concern for the welfare of his child, but it is not an essential condition; a person who assumes the role of parent, raising the child in his own home, may in time acquire an interest in the 'companionship, care, custody and management' of that child. The interest of the 'de facto parent' is a substantial one, recognized by the decision of this court in *Guardianship of Shannon* (1933) 218 Cal. 490 [23 P.2d 1020] and by courts of other jurisdictions and deserving of legal protection." (*In re B. G.* (1974) 11 Cal.3d 679, 692-693 [114 Cal.Rptr. 444, 523 P.2d 244],

fns. omitted; see Goldstein et al., Beyond the Best Interests of the Child (1973) pp. 17-20.)[5]

In summary, the interests of both Ronald W. and Donald R. vis-à-vis Michelle are subject to certain procedural and substantive protections no matter which of them is legally recognized as Michelle's father. Those protections are based on common law, constitutional, and statutory principles.

Both men have developed a parent-child relationship with Michelle. At different times, each man has willingly assumed full parental responsibilities for her. Each man appears to be entitled to the application of the procedural protections and substantive standards available to a "de facto parent" (*In re B. G., supra*, 11 Cal.3d at pp. 692-693) or one standing *in loco parentis* to a child (*Trudell* v. *Leatherby, supra*, 212 Cal. at p. 682; *Perry* v. *Superior Court, supra*, 108 Cal.App.3d at p. 486 (conc. opn. of Hopper, J.).)

The protections afforded by the common law are consistent with constitutional due process concerns which arise whenever an established parent-child bond is threatened. Such concerns are implicated whether the "parent" is a stepfather (see *Gribble* v. *Gribble, supra*, 583 P.2d at pp. 67, 68), a man who claims to be the biological father (*In re Lisa R., supra*, 13 Cal.3d at p. 649; see *Stanley* v. *Illinois* (1972) 405 U.S. 645 [31 L.Ed.2d 551, 92 S.Ct. 1208]), or a foster parent (*In re B. G., supra*, 11 Cal.3d at p. 693).

In addition to these constitutional and common law rights, each man would have certain statutory rights in future proceedings affecting his relationship with Michelle. Donald R. would be entitled to notice and an opportunity to be heard on the issue of his right to reasonable visitation with Michelle in any proceeding to dissolve his marriage to Michelle's mother. (§ 4351.5; see *ante,* at pp. 368-369.) Ronald W., even if the presumption that he is Michelle's father had been successfully rebutted, could be granted reasonable visitation rights. (§ 4601.)

The majority assume that Donald R.'s interest in establishing his biological paternity of Michelle is outweighed by Ronald W.'s competing interest

---

[5]The term "de facto parent" was used in *In re B. G.* "to refer to that person who, on a day-to-day basis, assumes the role of parent, seeking to fulfill both the child's physical needs and his psychological need for affection and care." (11 Cal.3d at p. 692, fn. 18.) The relationship of the term to the *in loco parentis* doctrine was not discussed. At least one court has used the two concepts interchangeably. (See *In re Marriage of Halpern, supra,* 133 Cal.App.3d at p. 310, fn. 3.)

In *In re B. G.,* the foster parents of minors who had been adjudged dependent children of the juvenile court were granted standing to appear as parties in juvenile court proceedings. (11 Cal.3d at p. 693.) The question "[w]hether constitutional principles of due process or equal protection may require that a de facto parent, in some instances, receive rights of notice, hearing, or counsel afforded natural parents or guardians" was expressly left open. (*Id.,* at p. 693, fn. 21.)

in protecting his developed parent-child relationship with her. The foregoing discussion exposes the fallacy of that assumption. In fact, Ronald W.'s relationship with Michelle is *not* in jeopardy. Their relationship has been reduced to one of regular visitation as the result of a marital dissolution. A judicial declaration that Donald R. is the legal and biological father of Michelle would not restrict or destroy that relationship.

On the other side of the scale, the majority obscure the nature of Donald R.'s interest by vaguely labeling his relationship with Michelle as an "association." (See maj. opn., *ante,* at p. 365, fn. 8.) However the bond between Donald R. and Michelle is labeled, it is clear that they currently enjoy a day-to-day parent-child relationship with all of the practical attributes of legal custody. Maintaining the continuity of that relationship is important to the child's psychological well-being. (See *Rethinking Parenthood, supra,* 70 Va. L.Rev. at pp. 902-911.) By denying plaintiffs the opportunity to establish that Donald R. is Michelle's legal father, the majority assure that their relationship stands on a shaky legal foundation.

For example, if Donald R. and Judith W. were to divorce, Judith W. would be entitled to sole custody of Michelle. (See § 4600, subd. (b)(1).)[6] If Judith W. died, Ronald W., not Donald R., would be entitled to sole custody as the legally recognized surviving "parent." (*Ibid.*) Donald R. would be entitled to custody only (1) if both Judith W. and Ronald W. had given their consent or died, or (2) if a court found that an award of custody to either of them would be detrimental to Michelle. (See § 4600, subds. (b)(2), (c); see generally, *Rethinking Parenthood, supra,* 70 Va. L.Rev. at pp. 912-919.)

Thus, Donald R.'s interest in establishing his paternity is far from abstract. If any of the asserted interests in this case is abstract, it is the state's interest in protecting the integrity of a nonexistent family.[7]

---

[6]Section 4600 sets forth an order of preference to be followed by courts in making custody awards "according to the best interests of the child . . . ." (§ 4600, subd. (b); see § 4608.) Under the statutory scheme, joint custody is preferred, followed by custody with either parent. (Subd. (b)(1).)

If custody is not awarded to either parent, the next order of preference is for placement with a "person or persons in whose home the child has been living in a wholesome and stable environment." (Subd. (b)(2).) Custody may not be awarded to a nonparent without the consent of the parents unless the court finds that an award of custody to a parent would be detrimental to the child. (Subd. (c).)

A noncustodial parent is entitled to reasonable visitation rights unless it is shown that visitation will be detrimental to the best interests of the child. (§ 4601.)

[7]The majority properly reject Ronald W.'s argument that the conclusive presumption of paternity should be upheld to protect Michelle from being branded an illegitimate. (Maj. opn., *ante,* at fn. 5.) I would go further and expressly disapprove the cases which have cited avoidance of the stigma of illegitimacy as a policy consideration supporting a conclusive

Whenever the conclusive presumption of paternity is challenged on due process grounds, competing interests must be carefully balanced. In this case, the result of that balancing process compels but one conclusion—that Donald R. must be permitted an opportunity to rebut the presumption. The recognized state interests in upholding the presumption are either non-existent or entitled to no deference under the circumstances of this case. The family unit for which the majority reserve such solicitude ceased to exist long ago. Similarly, plaintiffs' action poses no danger to the private interests of the "presumed" father, Ronald W.

On the other side of the scale is the emotional and familial bond which has developed between Donald R. and Michelle in their current living situation. Plaintiffs have demonstrated a substantial interest in establishing the legal foundation necessary to protect that bond. The majority have advanced

---

presumption. (*Estate of Cornelious, supra,* 35 Cal.3d at p. 465; *In re Madalina* (1917) 174 Cal. 693, 697 [164 P. 348, 1 A.L.R. 1629]; *Vincent B.* v. *Joan R.* (1981) 126 Cal.App.3d 619, 623 [179 Cal.Rptr. 9]; *In re Marriage of B.* (1981) 124 Cal.App.3d 524, 529-530 [177 Cal.Rptr. 429]; *People* v. *Thompson* (1979) 89 Cal.App.3d 193, 198 [152 Cal.Rptr. 478]; *County of San Diego* v. *Brown* (1978) 80 Cal.App.3d 297, 303 [145 Cal.Rptr. 483]; cf. *In re Lisa R., supra,* 13 Cal.3d at p. 650; *People* v. *Sorensen* (1968) 68 Cal.2d 280, 288-289 [66 Cal.Rptr. 7, 437 P.2d 495, 25 A.L.R.3d 1093]; *Estate of Lund* (1945) 26 Cal.2d 472, 480-482 [159 P.2d 643, 162 A.L.R. 606]; *Estate of McNamara* (1919) 181 Cal. 82, 95 [183 P. 552, 7 A.L.R. 313]; *Estate of Walker* (1917) 176 Cal. 402, 410 [168 P. 689]; *Cramer* v. *Morrison* (1979) 88 Cal.App.3d 873, 885 [153 Cal.Rptr. 865].)

Disapproval of these decisions to the extent that they rely on avoidance of the stigma of illegitimacy is supported by constitutional considerations. In this regard, the recent decision of the United States Supreme Court in *Palmore* v. *Sidoti* (1984) 466 U.S. 429 [80 L.Ed.2d 421, 104 S.Ct. 1879] is instructive. In that case, the court unanimously reversed the order of a Florida trial court which had awarded custody of a child to the father on the ground that the mother was cohabiting with a black man. The mother and the child were white. The trial court's decision had turned solely on "what it regarded as the damaging impact on the child from remaining in a racially-mixed household." (*Id.,* at p. 432 [80 L.Ed.2d at p. 425, 104 S.Ct. at p. 1881].) The trial court had stated that "despite the strides that have been made in bettering relations between the races in this country," the child would inevitably "suffer from the social stigmatization that is sure to come." (*Ibid.,* italics omitted.)

In reversing, the high court held that the possibility of stigmatization due to racial biases and stereotypes was not a legitimate basis for the custody determination. "The Constitution cannot control such prejudices but neither can it tolerate them. Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect." (*Palmore* v. *Sidoti, supra,* 466 U.S. at p. 433 [80 L.Ed.2d at p. 426, 104 S.Ct. at p. 1882].)

The court left no doubt that the constitutional imperative governed the actions of judicial officers. (*Palmore* v. *Sidoti, supra,* 466 U.S. at p. 432, fn. 1 [80 L.Ed.2d at p. 425, 104 S.Ct. at p. 1881]; *Shelley* v. *Kraemer* (1948) 334 U.S. 1 [92 L.Ed. 1161, 68 S.Ct. 836, 3 A.L.R.2d 441]; *Ex Parte Virginia* (1880) 100 U.S. 339, 346-347 [25 L.Ed. 676, 679].) " 'Public officials sworn to uphold the Constitution may not avoid a constitutional duty by bowing to the hypothetical effects of private racial prejudice that they assume to be both widely and deeply held.' " (*Palmore* v. *Sidoti, supra,* 466 U.S. at p. 433 [80 L.Ed.2d at p. 426, 104 S.Ct. at p. 1882], quoting *Palmer* v. *Thompson* (1971) 403 U.S. 217, 260-261 [29 L.Ed.2d 438, 464-465, 91 S.Ct. 1940] (dis. opn. of White, J.).) Private prejudice based on illegitimacy should be accorded no greater judicial deference.

no reason that will justify barring plaintiffs from making the attempt. Accordingly, I would reverse.