[No. H002148. Sixth Dist. Feb. 10, 1988.]

In re MICAH S., a Minor.
SANTA CLARA COUNTY DEPARTMENT OF SOCIAL
SERVICES, Petitioner and Respondent, v.
GLORIA S. et al, Objectors and Appellants.

[No. H001790. Sixth Dist., Feb. 10, 1988.]

In re MICAH S., a Person Coming Under the Juvenile Court Law.
ROBERT WEIGLE, as Chief Probation Officer, etc., Plaintiff and
Respondent, v.
GLORIA S. et al., Defendants and Appellants.

**COUNSEL**

Gary V. Crooks and Judy D. Goldman, under appointments by the Court of Appeal, Susan Myers and Goldman & Goldman, for Objectors and Appellants and Defendants and Appellants.

Donald L. Clark, County Counsel, and Diane L. Bennett, Deputy County Counsel, for Petitioner and Respondent and Plaintiff and Respondent.

**OPINION**

**AGLIANO, P. J.**—Gloria and Michael S. appeal a juvenile court order continuing their son, Micah,[1] as a dependent child and an order and judgment terminating their parental rights. We consolidated the two appeals for review and disposition. Appellants contend that the court failed to make a finding that termination was the least detrimental available alternative and that the reunification services offered them were inadequate. They also

---

[1] In both the briefs and the record, the child is referred to as both Micah and Michah. We have used the former spelling.

challenge the sufficiency of the evidence supporting termination and, last, allege that delays in the termination proceedings deprived them of due process. We find no error and affirm.

Micah was placed in protective custody at the age of seven weeks, on January 4, 1984, when appellants had no suitable place to live. On January 6 he was placed with foster parents who wish to adopt him. What appears to have been a combined jurisdictional and dispositional hearing was held on January 23, 1984, at which Micah was adjudged a dependent child under Welfare and Institutions Code section 300, subdivision (a) and continued in foster care. On March 27 appellants signed a reunification plan which called for them to visit Micah regularly, to complete a parenting program and to maintain suitable housing for six months, to participate in counseling and to complete a psychiatric evaluation.

A combined six-month review and permanency planning hearing was held on June 28, 1984. At this hearing, the juvenile court ordered county counsel to file a petition under Civil Code section 232 to terminate appellants' parental rights. Further review hearings were held on December 11, 1984, March 27, 1985, August 30, 1985, and February 7, 1986. Appellants appealed the order made at the latter hearing.

On October 18, 1984, respondent filed a petition alleging that grounds existed for termination of parental rights under Civil Code section 232, subdivisions (a)(6) and (a)(7). A Civil Code section 233 report was filed on November 27, 1984, and a supplemental report was filed on December 10. Hearings were held on the petition on February 15, 1985, April 18 and 19, 1985, August 1 and 26, 1985, and January 23, 1986. An order and judgment terminating appellants' parental rights on the basis of Civil Code section 232, subdivision (a)(6) was filed on March 28, 1986. Appellants appealed this judgment.

■    Appellants first argue that the juvenile court failed to make a finding that terminating their parental rights to Micah was the least detrimental alternative. (*In re Carmaleta B.* (1978) 21 Cal.3d 482, 489 [146 Cal.Rptr. 623, 579 P.2d 514].) This argument is specious. The termination judgment states: "The court has considered less drastic alternatives than the termination of parental rights and finds that granting the Petition is the least detrimental alternative." This finding is clear, specific and adequate.

This finding is also supported by substantial evidence in the record. (*In re Angelia P.* (1981) 28 Cal.3d 908 [171 Cal.Rptr. 637, 623 P.2d 198].) Testimony by the case worker established that she had explored the possibility of placing Micah with his maternal grandparents, with Gloria's sister, and

with his paternal grandfather. She also requested information from Michael's grandmother in Colorado about relatives there who would be willing to accept Micah's custody, although both appellants opposed placing Micah outside the area. It is hard to imagine what else could have been done to find a familial placement for Micah.

■ Next, appellants have a variety of complaints concerning the provision of reunification services. They argue that the reunification plan should have been developed more promptly, that no good faith effort was made to allow appellants to comply with the plan and that the court should have ordered further reunification services. A review of the facts belies these contentions.

The social report submitted for the jurisdictional and dispositional hearing revealed that Gloria S. had a history of psychiatric hospitalizations dating back to 1966, that Michael S. had a history of psychiatric hospitalizations dating back to 1976, drug and alcohol abuse problems, and six arrests since 1979. Micah's half-brother, born in 1971, was freed for adoption in 1978. A sister born in 1981 was made a dependent of the court that same year when Gloria was hospitalized in a psychiatric facility. This child was freed for adoption in 1983. Two psychiatric evaluations had been submitted in the latter case. One indicated that both appellants were psychotic and that the illness was severe. It concluded "The [S.'s] cannot even take care of themselves for more than a few weeks at a time. To place a child with them would not only endanger the child's welfare but seriously compromise their marginal ability to cope." The other evaluation concluded that both parents had "serious chronic continuing evidence of psychological impediments" and that "individually and conjointly, [they] are incapable of providing a safe and secure environment for their biological child" as a direct consequence of their illness.

The report also noted that the parents' chronic mental illnesses were the underlying cause of Micah's and his siblings' dependencies, and indicated that termination might be appropriate. It also contained a reunification plan[2] in narrative form which was identical in its scope to the document signed by appellants on March 27. This is sufficient to comply with California Rules of Court, rule 1376(b). This reunification plan was specific and concrete, unlike the plan criticized in *In re Bernadette C.* (1982) 127

---

[2]Under subsequently amended Welfare and Institutions Code section 361.5 (Stats. 1986, ch. 1122, § 13) reunification services need not be provided under certain circumstances, including, under subdivision (b)(2), where the court finds that a parent is suffering from "a mental disability that is described in paragraph (5) or (6) of subdivision (a) of Section 232 of the Civil Code and that renders him or her incapable of utilizing those services." The evidence in this case would have amply supported such a finding.

Cal.App.3d 618 [179 Cal.Rptr. 688]. Appellants were advised of these prerequisites to reunification by January 23, 1985, the date of the dispositional order, which reiterated the reunification requirements as conditions of Micah's dependency, and which was signed by both appellants.

The social report filed for the six-month review hearing established that appellants had made no progress towards reunification. Their housing remained unstable, they had attended only one parenting class, and they had refused to accept counseling or psychiatric treatment. On May 29, 1984, Gloria had been hospitalized in a psychiatric facility on a 72-hour hold. Even though Gloria received financial assistance through a payee representative program, appellants had trouble budgeting, frequently ran out of money by midmonth and were unable to pay their bills. Supervised visits with Micah had consistently shown appellants' lack of understanding of how to care for a small child. Appellants had established no relationship with their son as a result of these visits.

It is apparent from this record that appellants' unfortunate chronic mental illnesses were preventing them from adequately caring for Micah, and that the juvenile court had no choice but to recommend that the case proceed toward termination of appellants' parental rights, so that Micah could be freed for adoption.

Appellants also contend that the court should have ordered additional reunification services in light of the evidence presented at the termination hearings that in 1985, Gloria had shown improvement in her mental health. ■ Where there is a failure to order reunification services in the course of a child's dependency they may be offered, in the court's discretion, during a termination proceeding. (*In re Clarence I.* (1986) 180 Cal.App.3d 279, 283 [225 Cal.Rptr. 466]; *In re Susan M.* (1975) 53 Cal.App.3d 300, 311 [125 Cal.Rptr. 707]; *In re David B.* (1979) 91 Cal.App.3d 184, 198 [154 Cal.Rptr. 63].) But appellants cite no authority for the proposition that a court has discretion to order further reunification services prior to termination where those services were already provided during the child's dependency. ■ Even were a court to have this discretion, we would not find it abused on the record before us.

Two psychiatrists testified at the termination hearings concerning appellants' mental disability. Dr. White testified that Gloria S. had been hospitalized over 20 times during her more than 20-year mental illness and that she had better than an 80 to 90 percent chance of future hospitalizations. He believed Michael S. to be permanently disabled by his mental illness. Dr. Harper testified that he had had contact with Gloria S. since 1976, that he believed her to be chronically mentally disordered and that it was "beyond

my comprehension how she could maintain a degree of stability that is required for parenting a child." He believed Michael S. to be suffering from paranoid schizophrenia, and had seen him deteriorate since the doctor's first contact with him a year and a half before. In his opinion, neither Michael nor Gloria was likely to improve in the future and "it would take a miracle" for mental illness of the duration of appellants' to be successfully resolved. Not only would it be detrimental for Micah to be in appellants' care, but it would also put a terrible strain on appellants' already minimal ability to care for themselves.

This testimony corroborated the psychiatric evaluations of appellants performed by these practitioners in August 1984. In light of this evidence, it was reasonable for the court to treat Gloria's improvements as likely to be short-lived and not to reopen any realistic possibility for reunification. We find no abuse of discretion on this record.

■ We would merely create excess verbiage were we to reiterate this evidence in order to conclude that substantial evidence supports termination. The evidence was not only substantial, it was overwhelming. It is unfortunate that appellants, who love Micah and are concerned for his welfare, are unable, because of their chronic mental illnesses, to care for him. Nonetheless, it would have been impossible, on this record, for the trial court not to have concluded that appellants suffered from a mental disorder which rendered them unable to adequately care for and control Micah, as required by Civil Code section 232, subdivision (a)(6), and not to have sustained the termination petition on this basis.

■ Last, appellants contend their due process rights were violated by the fact the hearings on the termination petition, which took place on five separate days, lasted for a ten-month period. While such delay is lamentable, appellants have not demonstrated that they were in any way prejudiced. Our review of the record substantiates respondent's contention that several of these delays were for the convenience of appellants or their witnesses. The statutory preference for termination proceedings over civil matters expressed in Civil Code section 232.3 was not violated, since the case was heard before a juvenile court referee sitting, by stipulation of the parties, as a judge pro tempore. If anything, the delay worked to appellants' advantage since it gave them an opportunity to document the improvement in their situation during 1985. We find no violation, either of due process or of the statute, on this record.

The judgment and orders are affirmed.

Brauer, J., and Capaccioli, J., concurred.

**BRAUER, J.,** Concurring.—I join in the decision and the opinion of the court. I write separately, however, to draw the attention of higher authority, legislative and judicial, to serious problems which I believe to be unique to this area.

*First,* the factual context. This court sees what strikes me as a disproportionately large number of Civil Code section 232 (herein 232) cases. The appeals have one thing in common: their total lack of substance. It is true that colorable technical grounds are occasionally raised: advice to a parent of possible consequences was perfunctory, reunification services offered could have been more elaborate, and so on. When I refer to lack of substance, I speak of the merits. Here the issue has never been close. In every instance, the best interest of the child compelled the severance of parental ties. In no case in which independent counsel was appointed for the child did his investigation lead him to support the parents' cause. Micah S. is typical, and I use that word advisedly. Who but a sadist could possibly contemplate the return of this child to these parents? And that conclusion is not altered by the fact that for once the parents are more unfortunate than blameworthy.

The reason why only strong cases have reached this court is not hard to postulate. Child Protective Services, like other government programs, is overtaxed; as a result, the authorities can take note only of the most flagrant situations. While my experience is obviously not sufficiently extensive to permit of sweeping generalizations, the consistency of the records coming across my desk has been striking, and has doubtless flavored this analysis.

*Second,* the law is aware of the severity of the parents' possible loss[1] and zealously guards their rights. Not only does the statute accord parents the full panoply of procedural safeguards such as notice, advice of rights, continuances, periodic review and so on,[2] but more importantly, counsel is provided at public expense both in the termination proceedings and in the juvenile dependency actions under Welfare and Institutions Code section 300 (herein 300) which usually precede them, and both at the trial court level and on appeal.[3] In almost all cases, reunification attempts are mandated for a year and sometimes 18 months.[4] While initiation of 232 proceedings need not await the finality of 300 orders,[5] as a practical matter, the authorities frequently defer commencement of a termination action until

---

[1] *In re Jacqueline H.* (1978) 21 Cal.3d 170, 176 [145 Cal.Rptr. 548, 577 P.2d 683].

[2] See e.g., Welfare and Institutions Code sections 307, subdivision (b), 352, 353, 364; Civil Code sections 232.3, 235.

[3] Welfare and Institutions Code sections 317, 349, 395; California Rules of Court, rule 1377(i)(3); Civil Code sections 237.5, 237.7.

[4] Welfare and Institutions Code section 361.5.

[5] Welfare and Institutions Code section 395.

the dependency order has been affirmed on appeal. As in other areas where counsel is furnished at public expense, every petition, however meritorious, is vigorously challenged. "Cherchez l'avocat" is the battle cry of every appellate lawyer today.[6] As a consequence, no stone is left unturned, if only in pursuit of counsel's endeavor to protect his rear. And, of course, all contested judgments and appealable orders are in fact appealed.

All this takes time. A great deal of time. As of this writing, Michah S. has been in foster care for more than four years, that is, since the second month of his existence. The passage of five or more years from initial removal of the child from its home to ultimate resolution and repose is by no means unusual.

*Third.* All of the enumerated rights are vouchsafed the parents because the highest court in the land has determined that state intervention to terminate the relationship between parent and child invokes the Due Process Clause of the Fourteenth Amendment.[7] The potential deprivation has been analogized to criminal prosecutions, civil commitment, juvenile delinquency adjudications, deportation and denaturalization.[8] But while all of these proceedings are comparable in the magnitude of the individual's exposure to loss, the analogy is not totally apt. There is one fundamental difference. In a criminal trial, in mental incompetency determinations, in deportation cases and similar situations, the person facing sanctions is confronted by the state. The danger posed by his remaining at large is diffused among the population as a whole; if any specific individual has been particularly damaged or is menaced, he has his parallel remedies by money claim or injunction. The commonwealth can countenance granting the person confronted by the government all possible safeguards against erroneous disposition. It had better. The Constitution says so.

*But in 232 cases, every right afforded the parents, every reunification service ordered, every continuance, and especially every appeal taken is purchased at the expense of the person who is in law and morality the primary object of judicial solicitude, namely the child.* That, in a nutshell, is the frightful dilemma. And it is no longer open to question that the child's best interest must be paramount. Section 232, subdivision (b) categorically states

---

[6] Ineffective assistance of counsel is recognized as a ground for reversal in both 232 and 300 proceedings. (*In re Cristina H.* (1986) 182 Cal.App.3d 47, 50 [227 Cal.Rptr. 41]; *In re Christina P.* (1985) 175 Cal.App.3d 115, 129 [220 Cal.Rptr. 525]; *In re R. S.* (1985) 167 Cal.App.3d 946, 968-969 [213 Cal.Rptr. 690]; contra, *In re Ammanda G.* (1986) 186 Cal.App.3d 1075 as to 300 cases [231 Cal.Rptr. 372].

[7] *Santosky* v. *Kramer* (1982) 455 U.S. 745, 753 [71 L.Ed.2d 599, 102 S.Ct. 1388]. The dissenting justices did not disagree on this point. (*Id.,* at p. 774 [71 L.Ed.2d at p. 620].)

[8] *Santosky, supra,* at p. 762, 756, 759 [71 L.Ed.2d at pp. 612, 608, 610] and cases there cited which place such matters under the aegis of the due process clause.

that "[a]t all termination proceedings, the court shall . . . act in the best interests of the child." In case the point was missed, it is repeated in section 232.5. The Legislature's awareness of the harmful effect of delay is patent. Section 232.3, subdivision (a) states: "It is the public policy of this State that judicial proceedings to declare a child free from parental custody and control shall be fully determined as expeditiously as possible." The section goes on to place specific restrictions on the grant of continuances. And in Welfare and Institutions Code section 352, the lawmakers were even more emphatic: " . . . no continuance shall be granted that is contrary to the interest of the minor. In considering the minor's interests, the court shall give substantial weight to a minor's need for prompt resolution of his or her custody status, the need to provide children with stable environments, and the damage to a minor of prolonged temporary placements."

In placing the child's welfare at the top of the hierarchy of values and in recognizing the danger of procrastination, the Legislature is on firm ground. The treatise which has gained recognition as the most authoritative in this field is Goldstein, et al., Beyond the Best Interests of the Child,[9] and its sequelae, Before the Best Interests of the Child[10] and In the Best Interests of the Child.[11] The basic thesis of the authors, whose standing in law and psychiatry is preeminent, can be summarized quickly: The child's interests take precedence over the rights, needs and wishes of biological parents. The state should not lightly intrude into the relationship between parent and child. But once neglect, abandonment or abuse has dictated removal, the separation of a child from a parent has devastating emotional consequences so as to make imperative an early new bonding with a person or persons who fulfill a child's psychological needs for stability, interaction, companionship, interplay and mutuality. Foster placement, being temporary, does not do the trick because it warns the adults against any deep emotional involvement with the child. Even adoptive parents may hesitate to make a full commitment to the child as long as the placement is not irrevocable. The absence of a psychological parent must reflect the child's, not the adult's, sense of time. Perhaps the most poignant as well as most frequently quoted passage is: "Three months may not be a long time for an adult decisionmaker. For a young child it may be forever." On the basis of their investigations and professional judgment the authors conclude that the " . . . maximum intervals beyond which it would be unreasonable to

---

[9] The Free Press (2d ed. 1979). The book has been relied on by the California Supreme Court in *Burchard* v. *Garay* (1986) 42 Cal.3d 531, 538 [229 Cal.Rptr. 800, 724 P.2d 486]; *Michelle W.* v. *Ronald W.* (1985) 39 Cal.3d 354, 363 [216 Cal.Rptr. 748, 703 P.2d 88]; *Michael U.* v. *Jamie B.* (1985) 39 Cal.3d 787, 795 [218 Cal.Rptr. 39, 705 P.2d 362]; *In re Angelia P.* (1981) 28 Cal.3d 908, 917 [171 Cal.Rptr. 637, 623 P.2d 198] as well as by innumerable courts throughout the country.
[10] The Free Press (1979).
[11] The Free Press (1986).

presume that a child's residual ties with his absent parents are more significant than those that have developed between him and his longtime caretakers [are]: (a) 12 months for a child up to the age of 3 years at the time of placement; (b) 24 months for a child from the age of 3 years at the time of placement."[12] Poor Micah S.!

*Fourth.* What is to be done? As is so frequently the case, diagnosis does not guarantee a cure. Even if the parents' rights had not been held to arise out of the Constitution itself, one would be loath to tamper with them; after all, there is always the theoretical possibility of a malignant public official sundering a nurturing relationship for reasons best known to him. More generally, history warns against leaving crucial rights in the gift of officials. At any rate, that is the theory of our Constitution.

But it is clear that in the balancing process which inheres in any Due Process analysis, the pendulum must swing farther away from preoccupation with parents' rights and towards the protection of the waifs. It cannot be doubted that the Legislature's well-meaning pronouncements in favor of the child's best interests and speedy adjudication[13] have been palliatives at best. The one statutory change which may be expected to have an impact is Welfare and Institutions Code section 361.5 authorizing the juvenile court to omit reunification services under stated circumstances. I would favor an amendment broadening the dispensation where the court can make specific findings of probable futility of such services and detriment to the child. But that is not enough. Delay, an enormous quantum of delay, is built into any system providing free counsel;[14] and the problem was significantly exacerbated when "incompetence of trial counsel" became the most fashionable ploy of appellate lawyers. I have no doubt that the most serious bottleneck

[12] Beyond the Best Interests of the Child, *passim,* especially at pages 7 to 8, 98, 24, 22, 40-43; Before the Best Interests of the Child, page 46.

Another highly influential investigator who has arrived at basically the same conclusions is Professor Wald of Stanford Law School. (Wald, *State Intervention on Behalf of "Neglected" Children* (1976) 28 Stan.L.Rev. 623.)

[13] Some courts have not received the message. See e.g., *In re Venita L.* (1987) 191 Cal.App.3d 1229 [236 Cal.Rptr. 859]. There the court by fiat and in the absence of statutory mandate imposed a requirement of express finding in a Welfare and Institutions Code section 362 proceeding that return of the child would create a substantial risk of detriment to her. This in the face of *Michael U.* v. *Jamie B., supra,* 39 Cal.3d 787, 793 where the Supreme Court found no need for express findings in the analogous Civil Code section 4600 proceedings. The *Venita* court concluded that section 4600 is less specific than section 366.2, a conclusion that is not apparent to me from reading the two statutes. The case was remanded not for new findings but a full new hearing and, presumably, appeal. Venita L. had been in foster care almost since birth, for three and a half years prior to the appellate ruling with a husband and wife who wished to adopt her, with whom she had bonded and who, according to the expert evidence, were her psychological parents.

[14] I state the problem as fact, but I do not question the desirability indeed, necessity, of furnishing such counsel at public expense.

is the appeal, and that the plight of children in limbo cannot be ameliorated unless means are found to discourage the taking of appeals.[15] The reform I suggest is admittedly extreme; namely, that our Supreme Court in its role of supervising the conduct of lawyers promulgate a canon that appeals from orders terminating parental rights must be taken only when good grounds exist for the conclusion that the decision of the trial court, on the merits, is contrary to the best interest of the child. So radical a departure from the prevailing policy of encouraging appeals[16] can be justified only by recognition that 232 proceedings are indeed sui generis, different in kind rather than degree from all other controversies, that delay far beyond what the professional authorities consider acceptable is the rule rather than the exception in this field, that delay, by interfering with a new bonding, results in devastating psychological harm to children, that the Due Process rights of parents clash with children's rights of at least equal dignity, and that something must be done to afford these small human beings some chance for growth and a glimmer of future happiness.

The petition of appellant Gloria S. for review by the Supreme Court was denied May 4, 1988.

---

[15] I do not believe that assigning first priority to 300 and 232 appeals (Welf. & Inst. Code, § 395, whose wording has been in the books since 1915 (!) and Code Civ. Proc., § 45) has had a significant effect. No antidote has yet been devised to counsel's request for continuances to file briefs and reporters' similar motions with regard to transcripts. Nor am I sanguine as to the impact of Assembly Bill No. 703, 1987-1988 Regular Session, which, if enacted, will require the appellate courts "to take all reasonable steps" to assure that any 232 appeals are finally determined within 250 days of filing.

[16] If the Supreme Court may promulgate such a policy, see *In re Marriage of Flaherty* (1982) 31 Cal.3d 637, 648-650 [183 Cal.Rptr. 508, 646 P.2d 179], it doubtless has power to define its boundaries.