[No. G011380. Fourth Dist., Div. Three. May 28, 1992.]

In re CRISTELLA C., a Person Coming Under the Juvenile Court Law.
ORANGE COUNTY SOCIAL SERVICES AGENCY, Plaintiff and
Respondent, v.
JO ANN C., Defendant and Appellant.

**COUNSEL**

Meyer I. Goldstein, under appointment by the Court of Appeal, for Defendant and Appellant.

Terry C. Andrus, County Counsel, Gene Axelrod and Michelle Ben-Hur, Deputy County Counsel, for Plaintiff and Respondent.

Harold LaFlamme and Karen S. Cianfrani, under appointment by the Court of Appeal, for the Minor.

**OPINION**

**SILLS, P. J.—**

I

At birth, Cristella was jittery and irritable. Cocaine was in her blood, and she felt the pangs of withdrawal. Her mother, Jo Ann, was on parole at the

time, having been convicted of using and selling heroin in 1986. Jo Ann had used heroin and cocaine since 1984 and gone through a number of unsuccessful drug rehabilitation programs. Cristella's brother Victor, three years her elder, was also born suffering drug withdrawal. Cristella's natural father was nowhere to be found, having gone back to a wife and children in Mexico.

On January 30, 1989, just five days after her birth, the Orange County Social Services Agency filed a petition to put Cristella under the jurisdiction of the juvenile court. By February 10 Cristella was able to be moved from the hospital to an emergency shelter home. By April Cristella had been declared a dependent of the juvenile court, Jo Ann's counsel having stipulated there was clear and convincing evidence there was a substantial danger to Cristella's health if she was returned home.

For the first year of her life Cristella suffered a variety of medical problems. She was referred to the crippled children's services for a neurological evaluation. Doctors suspected she would need a craniotomy as her fontanels were prematurely closing, which would limit the ability of her brain to grow. In June she vomited fresh blood and clots, and needed an immediate endoscopy, a procedure where lighted implements are passed down the throat. Nevertheless, by October—when her case came up for a six-month review—Cristella had made outstanding progress at the emergency shelter home where her foster mother diligently monitored her numerous medical concerns.

Those six months had not seen as much progress for Jo Ann. She had been rearrested in March for petty theft and continued drug usage, and had been incarcerated at a state prison. She was released in September.

A social worker's report in preparation for the six-month review set up a number of conditions for Jo Ann to meet for unification with Cristella, including drug counseling, random drug testing, parenting classes, finding appropriate housing, and showing proof of a legally derived income. At the six-month review the court adopted the social worker's recommendations and scheduled a progress review hearing for January 1990.

By January Cristella's medical problems had improved significantly. She was receiving physical therapy twice a week.

Jo Ann, on the other hand, had declined participation in a perinatal drug treatment program and had not enrolled in any parenting classes. A social worker opined Jo Ann had not made sufficient progress to have Cristella returned to her and the court agreed.

Cristella's case came up for a 12-month review in April 1990. Again, she had made excellent progress. Her multiple medical problems had been resolved. She was at appropriate height and weight.

For her part, Jo Ann had made "some progress" and exhibited a "significant commitment" to Cristella and reunification. She had a job. She had completed a parenting class. Social workers thought there was a substantial probability Cristella *would* be returned to Jo Ann within six months. They did not, however, recommend immediate return and the court ordered that Cristella remain with her foster parents. At the review, the court noted the substantial progress Jo Ann had made toward mitigating and alleviating the "causes necessitating placement." The court noted Jo Ann had substantially complied with the social worker's service plan. Nevertheless, the court again adopted the social workers' recommendation. The court found, by clear and convincing evidence, that Cristella could not yet be returned to Jo Ann. It scheduled an 18-month review for the end of July.

The next six months, however, did not go well for Jo Ann. In April she was arrested for prostitution and spent the next two and a half months in jail. After she got out in July she missed a number of her weekly visits with Cristella. She did not complete drug testing or counseling. In October she was arrested again, this time for driving under the influence of narcotics. She obtained an early release from jail on November 21, which was a week before the 18-month review, which had been repeatedly continued during the previous 5 months.

At the 18-month review, the court found, by a preponderance of the evidence, that Cristella's return to Jo Ann would be detrimental to Cristella. Jo Ann had no source of income to support the child, no stable home, no understanding of Cristella's "special needs."

Reasonable reunification services had been offered, and the court determined they now should be ended. The court scheduled a hearing in March 1991 to permanently terminate Jo Ann's parental rights if it was likely Cristella would be adopted. The court believed Cristella deserved the opportunity to have a life with somebody she could count on.[1] Meanwhile, Cristella had been placed with new foster parents who were willing to provide her with a permanent home.

The hearing scheduled for March was continued to June. By then, a very positive relationship had developed between Cristella and her new foster parents. She viewed them as mommy and daddy. They wanted to adopt her.

---

[1] Cf. *In re Rikki D.* (1991) 227 Cal.App.3d 1624, 1632 [278 Cal.Rptr. 565]: "Children should not be required to wait until their parents grow up."

Jo Ann did not show up for the hearing set for the morning of June 5, and her default was taken. The court then terminated the parental rights of both Jo Ann and her husband.[2]

Later that morning Jo Ann arrived. The court set aside her default and set a new date for the termination hearing, which was eventually continued to August 5.

At the hearing Jo Ann presented her case against the termination of her rights. She had found a job as an assistant apartment manager. She had her own apartment. She had been off drugs since November 1990. She had undergone weekly drug tests. She was, in the words of her parole officer, "trying very hard to put her life together."

The court found by clear and convincing evidence that it was likely Cristella would be adopted. It also found, tracking the termination statute (Welf. & Inst. Code, § 366.26, subd. (c)(1)), that the prior finding made at the 18-month review (Cristella should not be returned to Jo Ann because it would be detrimental to Cristella), was a sufficient basis for the termination of Jo Ann's parental rights.[3]

Jo Ann now appeals from the judgment terminating those rights, arguing it was not enough that the court found Cristella was likely to be adopted by clear and convincing evidence. Jo Ann contends two decisions, one from the United States Supreme Court, *Santosky* v. *Kramer* (1982) 455 U.S. 745 [71 L.Ed.2d 599, 102 S.Ct. 1388], and the other from the California Supreme Court, *In re Angelia P.* (1981) 28 Cal.3d 908 [171 Cal.Rptr. 637, 623 P.2d 198], required the *prior finding* at the 18-month review must also have been made by clear and convincing evidence. Because the prior finding was based only on a preponderance of the evidence, she argues, she was denied due process of law in the termination of her parental rights.

---

[2] Cristella's natural father had not been heard from since before her birth and Jo Ann's husband at the time of Cristella's birth also did not show up, although both he and Jo Ann had received notice of the hearing by personal service. Accordingly, the default also encompassed Jo Ann's husband.

[3] Welfare and Institutions Code section 366.26, subdivision (c)(1) provides in part: "The court shall terminate parental rights only if it determines by clear and convincing evidence that it is likely that the minor will be adopted. If the court so determines, the findings pursuant to . . . Section 366.22 that a minor cannot or should not be returned to his or her parent or guardian, shall then constitute a sufficient basis for termination of parental rights . . . ."

Welfare and Institutions Code section 366.22, subdivision (a), provides in part that, at the 18-month hearing, the court "shall order the return of the minor to the physical custody of his or her parent or guardian unless, by a preponderance of the evidence, it finds that return of the child would create a substantial risk of detriment to the physical or emotional well-being of the minor."

## II

Jo Ann reads *Santosky* and *Angelia P.* too broadly. Neither case requires proof by clear and convincing evidence of every element necessary to terminate parental rights when there is clear and convincing evidence that if parental rights are terminated, the child will be adopted.

In *Santosky*, social workers in New York removed three children of a married couple after "incidents reflecting parental neglect" and petitioned the county family law court to terminate the couple's parental rights based on their "permanent neglect" of the children. (455 U.S. at pp. 749-752 [71 L.Ed.2d at pp. 603-605].) Under New York law at the time, the state could prove permanent neglect by a "fair preponderance of the evidence." (455 U.S. at p. 748 [71 L.Ed.2d at p. 603].) Such a finding would empower the New York family law court to permanently terminate parental rights. (455 U.S. at p. 749 [71 L.Ed.2d at p. 604].)

The couple challenged the constitutionality of the fair preponderance standard at the trial level, but the family court judge rejected it, and weighed the evidence under the preponderance standard. (455 U.S. at p. 751 [71 L.Ed.2d at p. 604].) The family court found permanent neglect (as defined by the statute[4]), and terminated the couple's parental rights. The case eventually reached the United States Supreme Court.

In a five-to-four decision authored by Justice Blackmun (joined by Justices Brennan, Marshall, Powell, and Stevens), the Supreme Court reasoned that the balance of the respective interests required a standard of proof reflecting greater than preponderance, which is based on a near equal allocation of the risk of an erroneous judgment. (See generally, 455 U.S. at pp. 752-768 [71 L.Ed.2d at pp. 605-616], and particularly p. 768 [71 L.Ed.2d at p. 616].) Use of a preponderance standard would mean near neutrality "between erroneous termination of parental rights and erroneous failure to terminate those rights." (See 455 U.S. at p. 765 [711 L.Ed.2d at p. 614].) This was "constitutionally intolerable" (455 U.S. at p. 768 [71 L.Ed.2d at p. 616]) because of the "relative severity" of the consequences of erroneous decisions. (455 U.S. at p. 766 [71 L.Ed.2d at p. 615].) In termination proceedings, parents risk the "unnecessary destruction" of their family. Children face "an uneasy status quo" in foster home placement. By contrast, the state's interest is in an *accurate* determination of the natural parents'

---

[4]To prove permanent neglect, the state needed to show either that the parents had failed to maintain contact with their children or had failed to plan for their future although physically and financially able to do so. (455 U.S. at p. 748 [71 L.Ed.2d at p. 603].) In *Santosky* the family law judge found the couple were incapable, even with public assistance, of planning for the future of their children. (455 U.S. at p. 752 [71 L.Ed.2d at p. 605].)

ability (or lack of it) to provide a normal family home for the child and in reducing the cost and relative burden of termination proceedings; those interests are themselves served by requiring a standard of proof greater than near equality. (455 U.S. at pp. 765-768 [71 L.Ed.2d at pp. 614-616].)

The court settled on an intermediate standard of proof—clear and convincing evidence. The highest standard—beyond a reasonable doubt—was not appropriate given the difficult nature of the issues in a termination proceeding, such as lack of parental motive, absence of affection, failure of parental foresight and progress. Use of the beyond-a-reasonable-doubt standard might "erect an unreasonable barrier" to freeing permanently neglected children for adoption. (455 U.S. at pp. 768-769 [71 L.Ed.2d at pp. 616-617].)

The court addressed the idea, advanced by the New York appellate court, that a preponderance standard "properly allocates the risk of error *between* the parents and the child." (455 U.S. at p. 765 [71 L.Ed.2d at p. 614].) The *Santosky* majority rejected this concept. The *Santosky* majority thought the idea rested on the unwarranted assumption that termination would "invariably" benefit the child. The child's *real* interest, according to the majority, was in avoiding an "erroneous termination." (*Ibid.*) The child could easily end up *worse off* with termination than without it, spending "years moving between state institutions and 'temporary' foster placements" after all ties to the natural parents had been severed. (455 U.S. at p. 765, fn. 15 [71 L.Ed.2d at p. 614].) In particular, the court noted that termination of parental rights does not necessarily ensure adoption. (*Ibid.*)

The dissent, written by Justice Rehnquist (joined in by Chief Justice Burger and Justices White and O'Connor) also concentrated on the relative interests at stake. It reasoned that because a preponderance standard requires the litigants share the risk of error in a near equal fashion, such a standard is appropriate when "the interests at stake are of roughly equal societal importance." (455 U.S. at p. 787 [71 L.Ed.2d at p. 628].) The New York statute was constitutional, according to the dissent, because the undesirable consequences of an erroneous finding were roughly equal in "either direction." An incorrect determination against terminating parental rights could relegate the child back to an abusive home, or worse, keep the child in "the unstable world of foster care." (455 U.S. at pp. 788-790 [71 L.Ed.2d at pp. 628-630] and in particular see p. 788, fn. 13 [71 L.Ed.2d at p. 628].)

*Angelia P.* involved a little girl who had been badly brain injured by a drunken, cruel lout of a natural father (28 Cal.3d at p. 914) and then placed with foster parents. The social services department eventually filed a lawsuit under Civil Code section 232 to free her from parental custody. The trial

court entered a judgment freeing her from parental custody and control, appointing the director of the social services department as her guardian, and referring her to the California Adoption Service for suitable placement. Both natural parents appealed, contending that "due process requires proof beyond a reasonable doubt in section 232 proceedings." (28 Cal.3d at p. 915.)

The California Supreme Court rejected their argument and affirmed the trial court's judgment, reasoning the "proof beyond a reasonable doubt standard is inappropriate in a section 232 proceeding where the state may be an adversary to the parents but also may be a necessary champion for the child." (28 Cal.3d at p. 919.) In the process, however, the court stated that the proper standard in a proceeding under Civil Code section 232 was proof by clear and convincing evidence. The court took special notice of Justice Harlan's concurring opinion in *In re Winship* (1970) 397 U.S. 358 [25 L.Ed.2d 368, 90 S.Ct. 1068], in which he pointed out that given the relative consequences of an erroneous verdict, the law employs the preponderance standard when mere money is involved. (See 28 Cal.3d at p. 918.) Because the "potential consequences of a section 232 proceeding" were "more serious" than a lawsuit where only money is at stake, a higher standard is required. (*Ibid.*)

In neither *Santosky* nor *Angelia P.* was there a likelihood of adoption. At most, the children in those cases *might* be adopted *eventually,* and then only after enduring more months and years in foster care. In each case the practical consequence of termination was consignment of the children to "foster care limbo." There was no likelihood of adoption and neither case considered a statute, like Welfare and Institutions Code section 366.26 under consideration here, which predicated termination of parental rights on such a likelihood in light of a background of repeated findings of parental fault.

The likelihood of adoption, however, changes the relative severity of the consequences of an erroneous decision on the child. With the likelihood of adoption, the child is subject to a dramatically different set of outcomes as a result of the termination hearing than was the case in *Santosky* or *Angelia P.* Instead of a bleak future in foster care limbo on the one hand, and return to a possibly abusive household on the other, the likelihood of adoption effectively realigns the consequences of an erroneous decision in termination proceedings: The alternatives are now life with a stable family who have already sacrificed for the sake of the child's well-being versus life with (more often than not) a single parent to whom return of the child has been repeatedly shown to be detrimental.

The case before us draws the essential nature of the child's newly aligned interests in bold relief. Cristella has never lived with Jo Ann. Cristella has

never known Jo Ann as her mother. Jo Ann's progress in extricating herself from drugs has waxed and waned, as have her efforts in "putting her life together" so Cristella could be returned to her.

Cristella had the bad fortune to be born a drug baby to a mother on parole and destined to go back to prison soon after her birth. Her natural father, as is too often the deplorable case, disappeared before her birth. She was born with numerous medical problems and at one time needed surgery. Yet, as the case comes to us now, there is a stable two-parent family waiting to give her a permanent home.

Not to mince words, erroneous *non*termination could have the effect of denying Cristella the opportunity to escape the drug and criminal culture into which Jo Ann has repeatedly mired herself. Given the fundamental choice in such a case as this—when a stable family is likely to adopt unless there is an erroneous nontermination—we cannot believe that the *Santosky* majority, the court in *Angelia P.*, and (most certainly) the *Santosky* dissenters, would not agree with us that the relative severity of the consequences of an erroneous decision—*one way or the other*—are at least roughly equal. Indeed, we do not believe it can be seriously contended that, in this context at least, the rights of a "drug baby" are not paramount to the rights of a "drug mother" (or "drug father" for that matter). The baby is the innocent victim of the parent's gross irresponsibility.[5]

---

[5]As Justice Froehlich pointed out in *In re Troy D.* (1989) 215 Cal.App.3d 889, 898 [263 Cal.Rptr. 869], the problem of babies "born under the influence of dangerous drugs due to their mothers' use of such drugs during pregnancy" is "severe." An estimated 11 percent of children born in United States hospitals have been exposed to such drugs. (*Ibid.*) It is common knowledge that such children often face a future of substantial behaviorial and physiological impairment; in effect, because of another person's irresponsibility, they start life with two strikes against them.

Ironically, if a child is born drug-addicted because of the negligence of a doctor, there will be a multimillion dollar medical malpractice lawsuit. Yet when the condition is caused by the parent's own intentional—indeed, vicious—conduct, the penalty is not personal monetary liability, but protective removal of the child plus the opportunity for parental rehabilitation at taxpayer expense over a 12- and possibly 18-month period.

The twin values of parental rights and child protection give rise to the need to strike a "'delicate balance.'" (See *Planned Parenthood Affiliates* v. *Van de Kamp* (1986) 181 Cal.App.3d 245, 258-259 [226 Cal.Rptr. 361].) We believe the California statutes under examination here afford a thoughtful attempt to strike that balance in light of the calamitous social problem of drug-addicted babies. If anything, they err on the side of leniency to the parents by adopting an adult-oriented (as distinct from child-oriented) time frame for rehabilitation of the parents while the child is in foster care. (See *In re Micah S.* (1988) 198 Cal.App.3d 557, 566-567 [243 Cal.Rptr. 756] (conc. opn. of Brauer, J.) [parental ties become less significant than those of longtime caretakers after 12 months for children under 3 years of age at time of placement]; accord, *In re Rikki D.*, *supra*, 227 Cal.App.3d 1624, 1632 [see fn. 1, *ante*].)

Thus, if anything, the social consequences are far graver if there is an erroneous nontermination than if there is an erroneous termination. An erroneous termination severs a relationship which, judging by this record, has never quite jelled. An erroneous *non*termination destroys Cristella's chances of becoming a permanent member in a stable two-parent family whose ties to her are now undoubtedly far stronger than those of her natural mother.

We do not hold, of course, that the requirement of clear and convincing evidence for adoptability is sufficient by itself to render the termination of parental rights constitutional. But when this requirement is added to a statutory scheme which includes the existing panoply of protections of parental rights, we cannot say that termination in such circumstances lacks "due process."

California's termination statutes, considered as a whole, set out a variety of safeguards of parental rights. These statutes remove children from their natural parents in the first place *only* after there is clear and convincing evidence of detriment (Welf. & Inst. Code, § 361, subd. (b)), provide natural parents with repeated warnings of the possibility of termination (Welf. & Inst. Code, §§ 361, subd. (b)(2), 366.21, subd. (e)), and presume the child should be returned to the parents unless the appropriate social services agency can prove otherwise (Welf. & Inst. Code, §§ 366.21, subd. (f), 366.22, subd. (a)). On top of this, the statutes require attorneys for indigent parents (Welf. & Inst. Code, § 317), provide reunification services to parents (Welf. & Inst. Code, § 361.5), and insure frequent judicial review to determine a parent's progress in alleviating or mitigating the causes that prompted the removal of the child in the first place (Welf. & Inst. Code, § 366, subd. (a)). These protections, *plus* the requirement adoptability be found on clear and convincing evidence, clearly afford due process of law to someone whose parental rights are ultimately terminated.

### III

Jo Ann makes two additional arguments, each of which is a variation on her contention regarding the proper standard of proof. Under Welfare and Institutions Code section 366.26, subdivision (c), the court is to refrain from terminating parental rights if termination will be detrimental to the child, as in the case where the parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship. (See Welf. & Inst. Code, § 366.26, subd. (c)(1)(A).)

Jo Ann claims the trial court contravened *Santosky* and *Angelia P.* in ruling that Jo Ann had the burden of proof on this point. In essence, she contends

the social service agency should have been required, by clear and convincing evidence, to prove that Cristella would *not* benefit from continuing the relationship.

Under the statute, there is no requirement that an absence of benefit from continuing the relationship be proved as an element of termination. The opportunity to stop termination if a parent proves benefit from continuing the relationship is simply an additional safeguard the statute affords parents.[6] It is analogous to the opportunity of a criminal defendant to prove insanity. Just as there is no constitutional requirement that the prosecution prove the *absence* of insanity beyond a reasonable doubt, so there is no constitutional requirement that the state prove that termination would not be detrimental by clear and convincing evidence.

Finally, Jo Ann asserts the initial order declaring Cristella a dependent child should also have been made by clear and convincing evidence because it is a "necessary precondition" for termination. The simple answer to this is that the record confirms the initial order *was* made by clear and convincing evidence based on the stipulation of Jo Ann's counsel.

The juvenile court's judgment is affirmed.

Moore, J., concurred.

**CROSBY, J.,** Dissenting.—The Supreme Court is already slated to determine whether that portion of Welfare and Institutions Code sections 366.26, subdivision (c)(1) which authorizes the juvenile court to terminate parental rights based in part on earlier findings made under a preponderance-of-the-evidence standard (e.g., Welf. & Inst. Code, §§ 366.21, subd. (f), 366.22, subd. (a)) is constitutional. (*Cynthia D. v. Superior Court* (1992) 3 Cal.App.4th 913 [4 Cal.Rptr.2d 909], review granted Apr. 23, 1992 (S025807); *In re Daniela M.* (1992) 3 Cal.App.4th 226 [4 Cal.Rptr.2d 290], review granted Apr. 23, 1992 (S025571).) The children affected by these statutory provisions are those who have become dependents of the juvenile court since 1989 and whose relationships with their parents were severed after they were removed from parental custody (Welf. & Inst. Code, § 361, subd. (b)); lived in an out-of-home placement for at least 12 months (Welf. & Inst. Code, §§ 366.21, 366.22); and, with their parents, were offered

---

[6]Jo Ann makes no argument that an absence of benefit from continuing the relationship is a *required element of termination proceedings under Santosky,* nor could she. *Santosky* said no such thing.

1374

reunification services (Welf. & Inst. Code, § 361.5, subd. (a)). The overwhelming number of termination appeals involve dependent children in this category.[1]

The Legislature made the drafting of the revised statutory scheme a high priority. Accordingly, it is with reluctance and dismay that I join the rising chorus criticizing the apparent deficiencies in the previously noted subdivisions of Welfare and Institutions Code sections 366.21, 366.22, and 366.26. Unlike my colleagues who have considered them to date, however, I conclude all the good intentions in the world are insufficient to save them.[2] In my view the new provisions run afoul of federal and state constitutional authority prohibiting the termination of parental rights on less than clear and convincing evidence. (*Santosky* v. *Kramer* (1982) 455 U.S. 745 [71 L.Ed.2d 599, 102 S.Ct. 1388]; *In re Angelia P.* (1981) 28 Cal.3d 908, 919 [623 P.2d 198].)[3]

California currently has two parallel statutory schemes for dependent children. One set of statutes applies to children who entered the juvenile justice system before 1989, and the other governs minors who become dependents on or after January 1, 1989. For those in the former category, there is no question that all the findings necessary to sever the parental relationship, regardless of the basis for the determination of parental unfitness, must be made under a clear-and-convincing standard. The controlling statute is Civil Code section 232; and subdivision (c) provides, "A finding

---

[1]Over the years, this court has seen far fewer appeals in cases involving minors whose parents abandoned them without providing identification for the children (Civ. Code, § 232, subd. (a)(1)); "suffer a disability because of the habitual use of alcohol [or] . . . controlled substances . . . or are morally depraved (Civ. Code, § 232, subd. (a)(3)); have been "convicted of a felony . . . of a nature so as to prove [unfitness to parent]" (Civ. Code, § 232, subd. (a)(4)); or are mentally disabled and "unable to adequately care for and control the child" (Civ. Code, § 232, subds. (a)(5), (a)(6); see fn. 4, *post.*)

[2]A number of juvenile court judges are avoiding the constitutional issue entirely by making the necessary findings at the 12- or 18-month review on clear and convincing evidence. For example, the court in this case did precisely that at the 12-month review, but employed the lesser standard at 18 months. In those cases where the finding relied upon to justify termination was made on the higher standard, I would agree reversal is not required, the constitutional infirmity in the statute notwithstanding.

[3]In *Angelia P.* the Supreme Court noted the Legislature waffled on the standard of proof question during the 1970's. At various times, Civil Code section 232, subdivision (a)(7) required proof beyond a reasonable doubt before parental rights could be severed. The clear and convincing standard had been in effect since July 1, 1978, however; and the court agreed it satisfied due process requisites while "serv[ing] and protect[ing] the interests and welfare of the child." (28 Cal.3d at p. 916, internal quotation marks omitted.)

pursuant to this section shall be supported by clear and convincing evidence."[4]

Under the revised system, the governing termination statute is Welfare and Institutions Code section 366.26. The portion of section 366.26, subdivision (c)(1) challenged here is the counterpart to Civil Code section 232, subdivision (a)(7); i.e., it is directed to dependents who have been in out-of-home placements for at least 12 months. It authorizes the juvenile court to sever parental rights based upon (1) a finding at the most recent six-month review, under the preponderance-of-the-evidence standard, that return of the dependent to the parental home would pose a "substantial risk [of] detriment to the physical or emotional well-being of the minor" (Welf. & Inst. Code, §§ 366.21, subd. (f), 366.22, subd. (a)) and (2) clear and convincing evidence the child is likely to be adopted.[5]

The emphasis on the likelihood of adoption is a key element in the new legislation. By requiring the juvenile court to find clear and convincing evidence of a dependent's adoptability before terminating parental rights, the

---

[4]Most of the termination appeals filed in this court have fallen under subdivision (a)(7) of section 232; i.e., they involved minors who were dependents of the juvenile court in out-of-home placements for more than 12 months. The Legislature has long required that the superior court order severing parental rights in those cases be accompanied by several contemporaneous findings, all made on clear and convincing evidence. For example, the court must conclude "that return of the child to the child's parent . . . would be detrimental to the child and that the parent . . . [has] failed during that period, and [is] likely to fail in the future, to maintain an adequate parental relationship with the child . . . ." (Civ. Code, § 232, subd. (a)(7).) Also, "[t]he court shall make a determination that reasonable services have been provided or offered to the parent[ ] which were designed to aid the parent[ ] to overcome the problems which led to the deprivation or continued loss of custody and that despite the availability of these services, return of the child to the parent[ ] would be detrimental to the child." (*Ibid.*)

Nevertheless, Welfare and Institutions Code section 366.2, added as of January 1, 1989 (Stats. 1987, ch. 1485, § 42, p. 5628) and applicable only to minors who became dependents of the juvenile court before 1989, tracks the language in Welfare and Institutions Code sections 366.21 and 366.22 and permits children to remain in out-of-home placements at six-month status review hearings if "by a preponderance of the evidence, [the court] finds [ ] the return of the child would create a substantial risk of detriment to the physical or emotional well-being of the minor." (Welf. & Inst. Code, § 366.2, subd. (e).) Unlike the situation involving children who become dependents of the juvenile court after 1988, however, these findings are not relied upon by the superior court in terminating parental rights per Civil Code section 232, subdivision (a)(7).

[5]All the other portions of section 366.26, subdivision (c)(1), drafted at the same time as the challenged provisions, retain the clear-and-convincing standard. For example, parental unfitness findings may be made on clear and convincing evidence "that the whereabouts of a parent have been unknown for six months or that the parent has failed to visit or contact the child for six months or that the parent has been convicted of a felony indicating parental unfitness." Also, a finding of parental unfitness may be based on the earlier decision, under Welfare and Institutions Code section 361.5, subdivision (b), not to offer reunification services, provided that determination is supported by clear and convincing evidence.

Legislature has taken an important step to guarantee that minors who have been abused or neglected are not subjected to the vagaries of long-term foster care.

But adoptability must not be permitted to supplant or influence the independent finding concerning parental unfitness. Mandating that both elements of the termination decision, i.e., parental unfitness and adoptability, be made on clear and convincing evidence is the only way to ensure the respective due process rights of parents and children.

While the provisions authorizing parental unfitness findings based on a preponderance of the evidence are radical departures from the long-standing law in the area, I have found no pertinent legislative analysis or history to aid courts or practitioners in understanding the rationale or justification for them. Nevertheless, the Legislature has been so consistent in maintaining, at a minimum, the clear and convincing standard in all previous and contemporaneous revisions (see, e.g., fn. 5, *ante*), it is difficult to conclude the change to preponderance of the evidence was an unintended oversight. (Compare *People* v. *Pieters* (1991) 52 Cal.3d 894 [276 Cal.Rptr. 918, 802 P.2d 420].)

My colleagues defend these changes on the basis that *Santosky* and *Angelia P.* do not require "proof by clear and convincing evidence of every element necessary to terminate parental rights when there is clear and convincing evidence that if parental rights are terminated, the child will be adopted." (Maj. opn., *ante*, pp. 1367-1368.) I disagree. Today's holding is not only unnecessary to the outcome, it is anathema to fundamental constitutional law as well.

"Drug" mothers and fathers, my colleagues say, by that status alone, forfeit the basic constitutional right to parent: "Indeed, we do not believe it can be seriously contended that, in this context at least, the rights of a 'drug baby' are not paramount to the rights of a 'drug mother' (or 'drug father' for that matter)." (Maj. opn., *ante*, p. 1371.) Accordingly, they hold that the relationship between drug addicted parents and their children may be severed on less than the clear-and-convincing standard mandated by both the United States and California Supreme Courts.

The key to the majority's thinking is found in their footnote 5 (maj. opn., *ante*, p. 1371). My colleagues would apparently deny, by judicial fiat, rather than legislative reform, any opportunity of rehabilitation to drug parents. Indeed, their solution to the drug crisis gives parents who have "been convicted of causing the death of another child through abuse or neglect"

(Welf. & Inst. Code, § 361.5, subd. (b)(4)) greater rights than parents who once used drugs. Only the Legislature has the right to make that decision; a pair of appellate judges certainly does not.

In espousing this notion, the majority purports to rely on the dissent in *Santosky* v. *Kramer, supra,* 455 U.S. 766. But the dissenting justices there did not see an exception for drug addicted parents to the long-standing and universally recognized principle "that the interest of parents in their relationship with their children is sufficiently fundamental to come within the finite class of liberty interests protected by the Fourteenth Amendment." (*Santosky* v. *Kramer, supra,* 455 U.S. at p. 774 [71 L.Ed.2d at p. 620] (dis. opn. of Rehnquist, J.).)[6]

I reiterate: The adoptability finding adds an extra measure of protection to the dependent minor. But it cannot be interpreted to strip mothers and fathers of their fundamental constitutional right to parent. It cannot give the juvenile court carte blanche to make parental unfitness decisions based on how cute or desirable a prospective adoptee may be. No government should have such power.[7]

A petition for a rehearing was denied June 17, 1992. Crosby, J., was of the opinion that the petition should be granted. Appellant's petition for review by the Supreme Court was denied August 13, 1992.

---

[6]Nonetheless, the dissenters thought a preponderance-of-the-evidence standard adequate to protect parental rights. How my colleagues can defend their position based on a dissenting opinion in the United States Supreme Court is beyond me.

[7]The Supreme Court should grant review of or depublish today's decision.