Filed 7/23/21  In re A.B. CA3

NOT <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Placer)

----

| | |
|---|---|
| In re A.B., a Person Coming Under the Juvenile Court Law. | C093609 |
| PLACER COUNTY DEPARTMENT OF HEALTH AND HUMAN SERVICES,<br><br>        Plaintiff and Respondent,<br><br>   v.<br><br>J.D.,<br><br>        Defendant and Appellant. | (Super. Ct. No. 53004893) |

J.D., mother of minor A.B., appeals from the juvenile court's orders terminating her parental rights.  (Welf. & Inst. Code, §§ 395, 366.26.)[1]  Mother's sole contention on

---

[1]  Undesignated statutory references are to the Welfare and Institutions Code.

1

appeal is that the juvenile court erred in failing to find the sibling relationship exception to adoption applied. We disagree and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

On May 17, 2019, the Placer County Department of Health and Human Services (Department) filed a section 300 petition on behalf of then four-year-old A.B. and her then 14-year-old half sister (sister). The petition was based on mother's alcohol and prescription drug abuse, A.B.'s father's substance abuse and untreated mental health issues, the parents' ongoing domestic violence, and the physical abuse of A.B. It was reported that, shortly before the petition was filed, mother had been intoxicated, become angry with A.B., grabbed her by the hair, threw her across the room, and punched her in the face.

In the weeks prior to the filing of the section 300 petition, A.B. and the sister were staying with the maternal aunt (aunt). The sister told the social worker that she was "terrified" to go back to mother's home due to the ongoing domestic violence. She had witnessed multiple occasions of mother punching father in the face and on the body. The sister would take A.B. to a bedroom to help protect her from the violence, of which there were "so many." The sister reported that during a recent incident a month earlier, mother had been drunk and trying to hit father (who was holding A.B.), but had missed and hit A.B. instead. The sister had seen bruising on A.B. and was afraid for her safety. A.B. told the aunt she did not want to go home and that, when she was at home, she had a hard time sleeping and would stay up all night, afraid of "monsters," although she slept well at the aunt's home.

The May 2019 section 300 petition was filed after another incident of domestic violence in the home. A.B. was detained in a foster home and the sister was released to her father's custody. The sister reported at the May 21 detention hearing that she and A.B. "have a really, really like good close bond." The juvenile court noted that the sibling relationship was important to both the sister and A.B. and that they needed to be

2

in regular communication; the court ordered supervised sibling visits twice a week, and authorized additional phone or video calls.

In July 2019, it was noted that the sister was missing many sibling visits because her father was not allowing her to attend. In her interview conducted for the July 2 report, the sister continued to report that she was close to A.B., telling the Department in the that A.B. was her best friend, they have a "super close" bond, and always do things together and have fun. A.B. was moved from the foster home to the aunt's home with continued sibling visitation two times a week.

In August 2019, the juvenile court took jurisdiction and ordered reunification services for both parents. The court ordered sibling visitation remain at a minimum of two times a week, with more visits authorized if the sister's schedule permitted. The sister was subsequently removed from her father and placed in the home of non-related extended family members (the Rs). A.B. was also moved to the Rs' home in November 2019.

In February 2020, A.B.'s therapist reported that since her placement with the Rs A.B. was more engaged and sharing more; she was starting to feel safe and secure in her placement. A.B. also reported that she was happy and felt safe in her placement. But she expressed that she was worried her parents would come and take her away from the Rs' home when Ms. R. was not there.

The parents refused to participate in services. They missed visits and exhibited poor behavior when they did attend, having outbursts and, on at least one occasion, a heated verbal altercation. They regularly failed to timely appear at hearings, stormed out of hearings, and were disruptive and disrespectful at the hearings they attended. They interrupted, cursed at, and insulted the judge. They yelled at, cursed at, threatened to sue, and insulted social workers. They also contacted a television show, which in turn contacted the Rs. After the Rs declined to provide confidential information to the show,

3

the parents harassed the Rs via social media with a barrage of insults and inappropriate statements.

The parents' services were terminated in August 2020.

In September 2020, the sister requested removal from the Rs' house, citing communication issues. She was moved to the home of another non-related extended family member who lived nearby. A.B. remained placed with the Rs and, although she was upset that the sister did not want to live with them anymore, she expressed that she did *not* want to move and wanted to live with the Rs "forever and ever." The Rs wanted to adopt A.B. (and the sister, if she changed her mind about placement with them). The Rs were informed about both adoption and guardianship; they chose adoption.

The section 366.26 hearing took place on February 10, 2021. The social worker testified that she had spoken with A.B., and that A.B. had said she wanted to continue living with the Rs. A.B. had been living with the Rs since November 2019 (approximately 14 months) and was reportedly doing very well. The social worker believed A.B. needed permanency and that adoption was in her best interests. The social worker was concerned that a guardianship would permit the parents to continue their harassing behavior and thereby threaten A.B.'s placement. A.B. had expressed that she loved and missed the sister, and the two had been visiting weekly with the department and the CASA (Court Appointed Special Advocate) worker facilitating the visits rather than the girls' respective caregivers. Although additional visits had been scheduled by the caregivers, the sister would not attend them because she "did not want to be around" the Rs.

The Rs favored continued sibling visits after adoption, but formal arrangements for continued visits were currently at a standstill because the sister did not want the visits to be supervised by the Rs and the Rs did not want the visits to be supervised by the sister's caregiver. The social worker did not have a position on whether sibling visits must be supervised, but Ms. R. testified that she was not currently comfortable having

4

visits that were away from home unsupervised because of A.B.'s insecurities. Ms. R. testified that after the CASA worker helped the sister move from the Rs' home, A.B. had explained that she was afraid the CASA worker would come and take her and move her to the sister's new home as well. A.B. also told the Rs she was worried that the sister's caretaker would return her to mother. Thus, Ms. R. did not want that particular CASA worker or the sister's caretaker supervising A.B.'s visits away from the Rs' home. Ms. R. did, however, invite the sister to spend time with A.B. and play alone with her on the Rs' large property, but the sister had not accepted the offer. Ms. R also offered to permit visits be supervised by a different CASA worker or by the sister's grandmother, but the sister had rejected both of those options as well.

Ms. R. also testified that she had twice tried to arrange a visit in the park with both herself and the sister's caretaker present. She got no response to the first offer, but was told that the second offer was accepted. When the sister did not show up for the visit, A.B. got very upset and said her sister did not want to see her. Ms. R. testified that she thought it was important that A.B. and the sister should remain in contact and spend time together. She indicated she would favor unlimited visits by the sister to their house, and the sister was always free to call.

The juvenile court permitted the sister to participate in the proceedings and she joined with the parents' in arguing that sibling relationship exception to adoption should apply. At the conclusion of the hearing, the court noted that, as all parties had agreed, the siblings did have a significant relationship. The court noted, however, that it had received limited evidence to indicate that termination of parental rights would be detrimental to A.B. Even approaching the case as if there would be no future sibling contact, the court found the benefits of permanency through adoption outweighed the benefits of continued sibling contact. In making its findings, the court noted that the evidence established that A.B. was very insecure in her placement and any change would be "devastating" to her. The court also noted that the sister would be 18 years old in two

years, and "beyond the reach of mother and litigation," but A.B. was only five. If a guardianship were established, there would be 13 more years of A.B.'s dependent childhood for the parents to continue their inappropriate, combative behavior and disrupt placement with the Rs. It was critical for A.B., who was already insecure, to know she was not going anywhere under any circumstances. The benefits of permanency through adoption outweighed the benefits of maintaining the sibling relationship in this case. The court found A.B. adoptable and terminated parental rights.

## DISCUSSION

Mother contends the juvenile court should have applied the sibling relationship exception adoption. We disagree.

At the selection and implementation hearing held pursuant to section 366.26, a juvenile court must choose one of the several " 'possible alternative permanent plans for a minor child. . . . *The permanent plan preferred by the Legislature is adoption.* [Citation.]' [Citation.] If the court finds the child is adoptable, it *must* terminate parental rights absent circumstances under which it would be detrimental to the child." (*In re Ronell A.* (1996) 44 Cal.App.4th 1352, 1368.)

The child has a compelling right "to have a placement that is stable, permanent, and that allows the caretaker to make a full emotional commitment to the child." (*In re Marilyn H.* (1993) 5 Cal.4th 295, 306.) "The Legislature has thus determined that, where possible, adoption is the first choice. 'Adoption is the Legislature's first choice because it gives the child the best chance at [a full] emotional commitment from a responsible caretaker.' (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1348 [disapproved on another point in *In re Caden C.* (May 27, 2021, S255839) 11 Cal.5th 614, 636, fn. 5].) 'Guardianship, while a more stable placement than foster care, is not irrevocable and thus falls short of the secure and permanent future the Legislature had in mind for the dependent child.' (*In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1344.)" (*In re Celine R.* (2003) 31 Cal.4th 45, 53.) "Even adoptive parents may hesitate to make a full

6

commitment to the child as long as the placement is not irrevocable." (*In re Micah S.* (1988) 198 Cal.App.3d 557, 566.)

There are only limited circumstances that permit the court to find a "compelling reason for determining that termination [of parental rights] would be detrimental to the child." (§ 366.26, subd. (c)(1)(B).) Termination of parental rights is detrimental to the child when "[t]here would be substantial interference with a child's sibling relationship, taking into consideration the nature and extent of the relationship, including, but not limited to, whether the child was raised with a sibling in the same home, whether the child shared significant common experiences or has existing close and strong bonds with a sibling, and whether ongoing contact is in the child's best interest, including the child's long-term emotional interest, as compared to the benefit of legal permanence through adoption." (§ 366.26, subd. (c)(1)(B)(v).)

There is a "heavy burden" on the parent opposing adoption under the sibling exception. (*In re Daniel H.* (2002) 99 Cal.App.4th 804, 813.) The legislative author of the sibling exception envisioned that its applicability would " 'likely be rare.' [Citation.]" (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 950.) This language from the legislative history has been interpreted to mean "that the child's relationship with his or her siblings would rarely be sufficiently strong to outweigh the benefits of adoption," particularly "when proceedings concern young children whose needs for a competent, caring and stable parent are paramount." (*Ibid.*; *In re Valerie A.* (2007) 152 Cal.App.4th 987, 1014.)

The party claiming the exception has the burden of establishing the existence of any circumstances that constitute an exception to termination of parental rights. (*In re C.F.* (2011) 193 Cal.App.4th 549, 553.) The factual predicate of the exception must be supported by substantial evidence, but the juvenile court exercises its discretion in weighing that evidence and determining detriment. (*In re Caden C., supra*, 11 Cal.5th at pp. 639-641; *In re K.P.* (2012) 203 Cal.App.4th 614, 622; *In re Bailey J.* (2010)

7

189 Cal.App.4th 1308, 1314-1315.)  We do not substitute our judgment for that of the juvenile court as to what is in the child's best interests.  (*In re Caden C.,* at p. 641.)

"To show a substantial interference with a sibling relationship the parent must show the existence of a significant sibling relationship, the severance of which would be detrimental to the child.  Many siblings have a relationship with each other, but would not suffer detriment if that relationship ended.  If the relationship is not sufficiently significant to cause detriment on termination, there is no substantial interference with that relationship."  (*In re L.Y.L., supra*, 101 Cal.App.4th at p. 952, fn. omitted.)

It was undisputed here that A.B. and her sister  have a significant sibling relationship.  But it is also clear from the facts of the case as recited above that the interdependency of relationship waned over time as the siblings lived separately from May to November 2019 and again from September 2020 through the hearing at issue, held in February 2021.  They were visiting a maximum of two times a week, and missing many visits in large part due to their own insecurities (A.B.) and actions (sister).  There was limited evidence of any detriment to A.B. that would arise from continuing and finalizing their separation.  The juvenile court's finding any detriment that might arise from the severance of that legal relationship, and even possible termination of the siblings' ability to visit with one another, was outweighed by the benefits of stability and permanence through adoption appears amply supported by the record in this case.

It is clear on this record, and the juvenile court expressly found, that removal from the Rs would be exceedingly detrimental (or "devastating," in the words of the juvenile court) to A.B.  The court found A.B. was insecure and needed "to know that she is not going anywhere under any circumstances."  Guardianship is not irrevocable and thus would not provide the secure and permanent placement conferred by adoption.

Moreover, there was no evidence presented that the Rs, from whom the minor's removal would be "gravely detrimental," were even willing to consider a guardianship. The record reflects only that when presented with a choice, they chose adoption.

Considering the parents' inappropriate and combative behavior, we cannot assume the Rs would agree to a guardianship. Indeed, faced with parents' threatening, aggressive, and wholly inappropriate behavior, maintenance of *any* permanent guardianship is hardly a foregone conclusion.[2] Thus, the balance in this case weighs even more heavily in favor of adoption, despite the possibility that the sibling relationship may not continue.

Finally, although the juvenile court assumed for purposes of its analysis that there would be no ongoing contact between A.B. and the sister, it remained hopeful that ongoing contact would occur. It was not a forgone conclusion here that termination of parental rights would substantially interfere with the sibling relationship. (See *In re D.O.* (2016) 247 Cal.App.4th 166, 175; *In re S.B.* (2008) 164 Cal.App.4th 289, 300.) Indeed, at the conclusion of the hearing, the court encouraged the sister (and the Rs) to compromise on visits for A.B.'s benefit. Additionally, weekly formal visits were being supervised by a CASA worker and were ordered to continue at the conclusion of the hearing. Further, there was no prohibition on telephone contact between the siblings. Ms. R. testified the sister could "always call" and that she had no objection to sibling contacts being initiated by the sister's caregiver. And telephone calls did not require the sister to be around the Rs, which apparently was her objection to visiting with A.B.

The same judicial officer presided over every hearing conducted in the matter, which had gone on for almost two years. This intimate familiarity allowed the juvenile court to assess A.B.'s needs and weigh the various competing factors in making its decision. We cannot reweigh the evidence or substitute our judgment as to what is in

---

[2] We reject mother's argument that reliance on the parents' ongoing misbehavior is unwarranted because they would be required to make a prima facie showing in a section 388 petition for modification in order to bring the guardians to court. The disruptive misbehaviors were not historically limited to setting court appearances.

A.B.'s best interests for that of the juvenile court, nor do we have any desire or reason to do so here.  (See *In re Caden C., supra*, 11 Cal.5th at p. 640.)  We find no error.

**DISPOSITION**

The orders of the juvenile court (terminating parental rights) are affirmed.


    /s/
    Duarte, J.


We concur:


    /s/
Hull, Acting P. J.


    /s/
Mauro, J.

10